WEST VIRGINIA STATE MEDICAL ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3746-86.          Filed September 20, 1988.

*George S. Bennett,* for the petitioner.
*James B. Martin,* for the respondent.

OPINION

FAY, *Judge:* These cases were assigned to Special Trial Judge Hu S. Vandervort pursuant to the provisions of section 7456(d)(3) of the Code (redesignated section 7443A(b)(3) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq. of the Tax Court Rules of Practice and Procedure.[1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

·VANDERVORT, *Special Trial Judge:* Respondent determined a deficiency in petitioner's Federal income tax for its 1983 taxable year, in the amount of $1,336. The issues for decision are:

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(1) Whether an exempt organization may, in calculating its unrelated business taxable income, offset the income from one unrelated activity with the losses from another unrelated activity; and,

(2) Whether the advertising activities which petitioner conducted in its business league journal constitute a trade or business.

### FINDINGS OF FACT

Some of the facts have been stipulated. This reference incorporates the stipulation of facts and attached exhibits.

Petitioner was a corporation with its principal office in Charleston, West Virginia, when it filed the petition in this case.

Petitioner, a business league exempt from Federal income taxation under section 501(c)(6), is a medical association whose members are physicians practicing in West Virginia. Its exempt purpose is to "federate * * * the entire medical profession of the State of West Virginia * * * and to extend medical knowledge, advance medical science, and promote public health." As part of its exempt purpose, petitioner publishes the West Virginia Medical Journal (Journal), a monthly magazine which is circulated to its members. Merwyn G. Scholten (Scholten), who testified at trial, is the executive director of petitioner and, in the past, has been the executive editor of the Journal.[2]

The Journal consists of two to four scientific articles per issue concerning medical topics of interest to the members. General news and reports of actions and activities, whether governmental or social, are also listed in the Journal. In addition to the articles and listings, the Journal carries paid advertisements.

The Journal sells space to "any advertiser who wishes to sell a legitimate product and service within the realm of decency and good taste." While most of the advertisements are for either health or medical products, other products which may be of interest to physicians are also advertised in the Journal. Public service advertisements are published at no cost if space is available.

---

[2]Mr. Scholten became executive director on Apr. 23, 1984, subsequent to the year in issue. His predecessor is now deceased.

The majority of the Journal's advertisements are prepared professionally and arrive as set copy ready for print. Frequently, pharmaceutical advertisements arrive as printed inserts which are then placed in the Journal. In addition, the Journal will occasionally set type for a local advertiser.

During the relevant period, petitioner regularly kept business records, maintained a professional staff for the Journal, and devoted substantial time to its publication. From 1980 to 1985, printing labor costs increased 25 percent, paper costs increased 27 percent, and other costs increased from 3 to 5 percent. In an attempt to counter this, the Journal considered proposals and bids from competing printers which were lower than its current printer. The Journal, however, decided not to change because its current printer was located near to its offices.

Along with other State medical journals, the Journal is a member of the State Medical Journal Advertising Bureau (bureau). The bureau's purpose is to solicit advertisements from major pharmaceutical companies and other national advertisers on behalf of its members. For its services, the bureau is paid a commission for advertising copy placed in its members' journals.

Although the bureau sells most advertising space nationally, petitioner has sent letters to pharmaceutical firms and other national firms to solicit advertisements independent of the bureau. In addition, petitioner has made efforts to increase local advertising.

The bureau annually sends rate surveys to its members to establish the cost to the advertiser per thousand readers, a standard industry measure. The results of the rate surveys are then used by the bureau's members to analyze and determine their advertising rates. In addition to using these rate surveys, the Journal considers its own cost factors to determine the price of advertising.

In the early 1960s, Senator Estes Kefauver chaired Senate subcommittee hearings (Kefauver hearings) to investigate whether Merrill Pharmaceuticals withheld information on the side effects of certain products. As a result of the Kefauver hearings, Congress moved to strengthen the Food and Drug Administration and restricted advertising for newly developed drugs. Following the congressional action,

pharmaceutical advertising in medical journals declined and has never recovered.

Petitioner has claimed the following losses from its advertising activity in the Journal:

| Year | Amount of loss |
| --- | --- |
| 1974 | $25,125 |
| 1975 | 33,858 |
| 1976 | 63,786 |
| 1977 | 19,829 |
| 1978 | 22,646 |
| 1979 | 36,165 |
| 1980 | 39,807 |
| 1981 | 41,741 |
| 1982 | 42,042 |
| 1983 | [3]21,810 |
| 1984 | 29,707 |
| 1985 | 18,874 |
| 1986 | 20,087 |

Moreover, petitioner has not made a profit on its advertising activity since 1962.

Separate from its advertising activity, petitioner also received revenue in 1983 from I.C. Collection Systems, a national organization that collects overdue accounts for doctors. During 1983, I.C. Collection Systems paid petitioner a $9,908 commission for endorsing and marketing its collection services.[4]

In 1983, the Journal reported $33,163 in gross advertising income and deducted $54,973 direct advertising costs which resulted in a $21,810 loss. This loss was applied to offset the $9,908 unrelated business taxable income received from I.C. Collection Systems in 1983. Respondent determined that such an offset is impermissible.

OPINION

The issues for decision are:

(1) Whether an exempt organization may, in calculating its unrelated business taxable income, offset the income from one unrelated activity with the losses from another unrelated activity; and,

---

[3]Year at issue.

[4]In years subsequent to 1983, petitioner has also received income from its endorsement of a national insurance carrier.

(2) Whether the advertising activities which petitioner conducted in its business league journal constitute a trade or business.

Petitioner is a medical association exempt from Federal income taxation under 501(c)(6). See sec. 1.501(c)(6)-1, Income Tax Regs. An exempt association recognizes neither income nor losses related to its exempt purpose. Sec. 501(a). Income from a trade or business which is unrelated to its exempt purpose, however, is taxed as unrelated business taxable income. Secs. 501(b) and 511.

Unrelated business taxable income is defined as income derived from any unrelated trade or business regularly carried on by the exempt association. Sec. 512(a)(1). An unrelated trade or business is defined as a trade or business, the conduct of which is not substantially related to the exercise or performance of the exempt organization's purpose. Sec. 513(a). Accordingly, an exempt association's activity is subject to unrelated business tax under section 511 if:

(1) The income is derived from a "trade or business";

(2) The trade or business is regularly carried on by the organization; and

(3) The conduct of the trade or business bears no substantial relation (other than through the production of funds) to the organization's exempt purpose.

Sec. 1.513-1(a), Income Tax Regs.; see *United States v. American College of Physicians*, 475 U.S. 834 (1986); *United States v. American Bar Endowment*, 477 U.S. 105 (1986); *Florida Trucking Association v. Commissioner*, 87 T.C. 1039 (1986); *Fraternal Order of Police v. Commissioner*, 87 T.C. 747 (1986), affd. 833 F.2d 717 (7th Cir. 1987).

The taxation of business income not substantially related to the objectives of an exempt organization dates from the Revenue Act of 1950 (1950 Act). Prior law had allowed exempt organizations to use profits from unrelated activities to further their exempt purposes without regard to the source of those profits. See *Trinidad v. Sagrada Orden de Predicadores*, 263 U.S. 578, 581 (1924). As a result of this prior law, exempt organizations were able to compete with corporations whose profits were fully taxable. That is, exempt organizations were able to use their profits to

expand operations, while their nonexempt competitors could expand only with the profits remaining after taxes.

Congress viewed this as an unfair advantage to exempt organizations and enacted the 1950 Act to eliminate the unfair competition that the tax laws had created. See *United States v. American College of Physicians, supra;* S. Rept. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483, 504-505. In doing so, however, Congress did not force exempt organizations to abandon commercial ventures. Rather, Congress imposed a tax on the unrelated business taxable income of exempt organizations with the hope of encouraging exempt enterprises while restraining unfair competition for nonexempt businesses. Sec. 511(a)(1); *United States v. American College of Physicians, supra.*

In 1967, regulations were promulgated that interpreted the unrelated business income provision of the 1950 Act. The regulations defined "trade or business" to include not only a complete business enterprise, but also any component activity of a business. Sec. 1.513-1(b), Income Tax Regs. This approach is commonly referred to as "fragmenting" the enterprise into its component parts.

Fragmenting a trade or business of a publication such as a trade journal had a significant effect on advertising, which had previously been considered simply a part of a unified publishing business. The new regulation segregated the "trade or business" of selling advertising space from the "trade or business" of publishing a journal, and thus treated each activity as an unrelated trade or business activity. In the promulgated regulations, the Treasury Department stated:

In general, any activity of a section 511 organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of section 162—and which, in addition, is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax. Accordingly, for purposes of section 513 the term "trade or business" has the same meaning it has in section 162, and generally includes any activity carried on for the production of income from the sale of goods or performance of services. Thus, the term "trade or business" in section 513 is not limited to integrated aggregates of assets, activities and goodwill which comprise businesses for the purposes of certain other provisions of the Internal Revenue Code. Activities of producing or distributing goods or perform-

ing services from which a particular amount of gross income is derived do not identify a trade or business merely because they are carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. * * * *activities of soliciting, selling, and publishing commercial advertising do not lose identity as trade or business even though the advertising is published in an exempt periodical which contains editorial matter related to the exempt purposes of the organization.* * * * [Sec. 1.513-1(b), Income Tax Regs.; emphasis supplied.]

Congress, in the Tax Reform Act of 1969 (1969 Act), specifically endorsed the proposed concept of "fragmenting" the publishing enterprise into its component activities. In fact, the 1969 Act adopted much of the language of the regulation that defined advertising as a separate trade or business. Following the 1969 Act, section 513(c) provided:

Advertising, Etc., Activities.—For purposes of this section, the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may or may not, be related to the exempt purposes of the organization. Where an activity carried on for profit constitutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit.

Section 513(c) was amended, effective January 1, 1970. The House committee report issued in connection with the amended section stated:

Your committee believes that a business competing with taxpaying organizations should not be granted an unfair competitive advantage by operating tax free unless the business contributes importantly to the exempt function. It has concluded that by this standard, advertising in a journal published by an exempt organization is not related to the organization's exempt functions, and therefore it believes that this income should be taxed.

\*      \*      \*      \*      \*      \*      \*

Under this provision, it is anticipated that advertising income from publications (whether or not the publications are related to the exempt purpose of the organization) will constitute unrelated business income to the extent it exceeds the expenses related to the advertising, and, if the

editorial aspects of publication are carried on at a loss, to the extent it exceeds this loss. * * *

[H. Rept. 91-413 (1969), 1969-3 C.B. 199, 232.]

Also in connection with the 1969 Act, the Senate committee made the following comments:

The committee agrees with the House that the regulations reached an appropriate result in specifying that when an exempt organization carries on an advertising business in competition with other taxpaying advertising businesses, it should pay a tax on the advertising income. * * * For this reason, the committee agrees with the House that the regulations, insofar as they apply to advertising and related activities, should be placed in the tax laws. [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 472.]

After reviewing the legislative history, we conclude that to determine whether losses from an unrelated activity may be used to reduce the exempt organization's unrelated business taxable income, the activity must be held to the same trade or business standard as a nonexempt organization activity. To hold otherwise would allow an exempt organization to receive a benefit not available to a nonexempt organization, from an activity which is in direct competition with the nonexempt organization's activities. Such benefit to the exempt organization would be a lower aggregate tax liability for all of its unrelated business activities. This is the precise result Congress intended to avoid. Accordingly, advertising losses from the Journal may offset petitioner's unrelated business taxable income only if, in the first instance, it is held that the advertising activity is a trade or business. Sec. 1.512(a)-1(f), Income Tax Regs.

Whether an exempt organization can offset a loss from a nonexempt activity against income from another nonexempt activity, where the loss activity is not a trade or business because of the lack of profit objective, has been addressed in the Sixth Circuit and Second Circuit, which reached diametrically opposed results. Both of the circuit cases arose in the context of social clubs exempt from tax under section 501(c)(7).

In *Cleveland Athletic Club v. United States*, 779 F.2d 1160 (6th Cir. 1985), the Sixth Circuit held that a social club could offset the loss created by excess expenses against other income to determine its unrelated business taxable income, even though the loss activity lacked a profit

objective. The court held that ordinary and necessary business expenses are allowed to be deducted against unrelated business taxable income where the basic purpose of the activity is economic gain and that a profit motive is not required.

In *The Brook, Inc. v. Commissioner*, 799 F.2d 833 (2d Cir. 1986), affg. in result a Memorandum Opinion of this Court, the Second Circuit expressly rejected the "economic gain" test and adopted a traditional "trade or business" test. The court held that a social club could not offset a loss from one activity against other unrelated business taxable income absent a profit motive in respect of the loss activity.

We do not have to resolve the conflict between the Sixth and Second Circuits since those cases involved social clubs under section 501(c)(7), and turned on section 512(a)(3)(A), rather than a business league under section 501(c)(6), which implicates section 512(a)(1). See *North Ridge Country Club v. Commissioner*, 89 T.C. 563 (1987), on appeal (9th Cir., Jan. 29, 1988). We note, however, that both circuits state, albeit in dicta, that the lack of a profit objective with respect to one activity would preclude, under section 512(a)(1), the offset of losses from that activity against income from another activity which does have a profit objective.

An activity of an exempt organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute a trade or business within the meaning of section 162 is a trade or business for purposes of the tax on unrelated business income. Sec. 1.513-1(b), Income Tax Regs. To be a trade or business, the taxpayer must be involved in the activity in question with continuity and regularity and "the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987). See also sec. 513(c).

It is not disputed that petitioner is a section 501(c)(6) exempt organization, or that its advertising activity was not substantially related to its exempt purpose. Further, it is agreed that the direct advertising costs were allocated correctly and were ordinary and necessary. Finally, it is agreed that petitioner was involved in its advertising

activity in the Journal continuously and regularly. The issue, then, is whether the advertising activity was engaged in primarily for income or profit.[5] Petitioner bears the burden of proving that the advertising activity was entered into for profit. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a).

Generally, advertising is a means to generate revenue. Petitioner, however, has chosen to incur direct advertising costs that have exceeded advertising revenue for 21 consecutive years. Petitioner has failed to explain why it has consistently incurred losses that could have been avoided had it discontinued the advertising activity.

The advertising activity losses evidence a lack of profit objective and, accordingly, such activity cannot be deemed to be a trade or business. See sec. 1.183-2(b)(6), Income Tax Regs.; *Golanty v. Commissioner,* 72 T.C. 411, 416 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); *Bessenyey v. Commissioner,* 45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir.), cert. denied 389 U.S. 931 (1967). Accordingly, the Journal's advertising losses may not be used to reduce the unrelated business income.

*Decision will be entered for the respondent.*

---

[5]Whether petitioner published the Journal as a trade or business is not relevant since it is deemed to be an exempt function. See *United States v. American College of Physicians,* 475 U.S. 834 (1986).