NATIONAL WATER WELL ASSOCIATION, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22420-83.       Filed January 24, 1989.

*Robert D. Marotta* and *Michael A. Mess,* for the petitioner.

*Genevieve K. Murtaugh,* for the respondent.

## OPINION

PARKER, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for its fiscal year ended October 31, 1980 in the amount of $21,082. The issues for decision are:

(1) Whether insurance dividends received by petitioner, a business league exempt from taxation under section 501(c)(6),[1] as the group policyholder of an insurance program that the business league endorsed constitute unrelated business taxable income under section 512; and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in question, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(2) If so, whether the income is excludable from the unrelated business tax as royalties under section 512(b)(2).

This case was submitted fully stipulated under Rule 122. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner, National Water Well Association, Inc., is a corporation with its principal place of business in Worthington, Ohio, at the time the petition was filed in this case. Petitioner is a corporation organized under the laws of the State of Ohio.[2]

After incorporating in the State of Ohio, petitioner filed an Application for Recognition of Exemption, Form 1024, with the Office of the Internal Revenue Service in Cincinnati, Ohio, on June 7, 1979. This exemption was granted and petitioner is now a business league exempt from Federal income tax under section 501(c)(6). Petitioner filed a Return of Organization Exempt from Income Tax, Form 990, for the taxable year ending October 31, 1980, with the Internal Revenue Service Center in Cincinnati, Ohio.

Petitioner is an association composed of persons engaged in the water well industry. In 1980, petitioner had approximately 8,000 members grouped into five divisions, which included (1) the contractors division composed of individuals and companies engaged in the business of water well drilling, (2) the manufacturers division composed of individuals and companies engaged in manufacturing equipment, materials, or supplies used in the water well industry, (3) the suppliers division composed of individuals and companies that supply equipment (on a wholesale or retail basis) to the water well industry, (4) the ground water technology division composed of colleges and universities studying or teaching subjects related to the water well industry, and geologists and other professionals involved in the evaluation, development, or investigation of ground water, and (5) the pump installation contractors division composed of individuals and companies engaged in the business of water

---

[2] Petitioner is the surviving corporation in a merger on Dec. 29, 1978, with National Water Well Association, Inc., an Illinois corporation that was incorporated on Mar. 19, 1949, under the General Not for Profit Act of Illinois. The Internal Revenue Service issued an exemption letter to the Illinois corporation on May 9, 1950, under sec. 101(7) of the Internal Revenue Code of 1939, which is now sec. 501(c)(6). The sole reason for the merger was to transfer the State of incorporation from Illinois to Ohio.

systems or pump installation, maintenance, or repair. The governing document of petitioner is its bylaws. The bylaws specify:

The objectives of this association shall be: to assist, promote, encourage, and support the interests and welfare of the water well industry in all of its phases; to foster, aid and promote scientific education, standards, redevelopment, and to advance the science of ground water hydrology; to promote harmony and cooperation between well contractors and scientific agencies relative to the proper development and protection of underground water supplies; to encourage cooperation of all interested groups relative to the improvement of drilling and pumping equipment; to encourage, serve, assist and promote closer cooperation among the existing state water well contractors' associations and to foster the development of such associations in states where they do not exist; to collect, analyze, and disseminate to the public facts about the role of the water well industry in the economy of the nation; and to advance generally the mutual interests of all those engaged in the water well industry, in their own and the public interest.

The management and control of petitioner is vested in its board of directors, which consists of nine members of the contractors division, the immediate past president, and two members of each of the other four divisions. Petitioner maintains a staff that manages and operates the organization. This staff's duties include membership administration and relations, production of related publications, presentation of educational programs for the water well industry, research in the water well and ground water fields, and promotion of safety programs.

Petitioner sponsors various insurance programs for its members. During the year in issue, the programs petitioner sponsored included life insurance, accident and disability insurance, industry casualty insurance, errors and omissions insurance, and health insurance.

At one time, water well drillers were classified, for insurance purposes, in the same category as oil well drillers. Several years before the year in issue, petitioner conducted a study that showed that the safety experience record for water well drillers was better than the safety record of oil well drillers and justified a separate classification for water well drillers. As a result of petitioner's study, Maryland Casualty Insurance Co. (hereinafter referred to as Maryland Casualty) agreed to classify water well drillers as a less

risk-prone industry than previously classified. Based on this classification, Maryland Casualty developed a comprehensive industry casualty insurance program for the water well industry, which included coverage for workers' compensation, general liability, business equipment liability, and automobile liability insurance. This insurance program will be referred to hereinafter as either the "industry casualty insurance program" or the "safety dividend casualty program." Maryland Casualty was the insurer, and the insurance brokerage company that managed and monitored the program was the "Planning Corporation," located in Vienna, Virginia.

Petitioner agreed to endorse and sponsor Maryland Casualty's comprehensive industry casualty program, known as the safety dividend casualty program. Petitioner became the group policyholder of this insurance policy. Petitioner entered into a written agreement with Maryland Casualty in which petitioner agreed to: (1) Provide assistance to Maryland Casualty in endorsing, promoting, and sponsoring the insurance program, (2) give Maryland Casualty cooperation and advice in presenting the insurance program to potential participants, (3) make known the availability of the insurance program to its members, (4) not sponsor or endorse any other property or casualty insurance program nor allow its list of property or casualty insured risks to be disseminated to other parties for purposes of direct or indirect solicitation for any other property or casualty insurance program, (5) cooperate with and assist Maryland Casualty, upon its request, in the collection of any premiums that are payable to Maryland Casualty under the insurance program by providing it with available pertinent information that may facilitate collection of the premiums, and (6) obtain the written approval of Maryland Casualty for any promotional literature referring to the insurance program before distributing it to its members.

In fulfilling these contractual obligations, petitioner provided Maryland Casualty and/or the Planning Corporation with its membership lists, wrote articles on safety and its effects on insurance, provided exhibit space for Maryland Casualty at its conventions and meetings, and answered inquiries from present and potential policyholders regarding

the insurance. Petitioner also placed advertisements in its journals for National Water Well Association-sponsored insurance, which specified that the reader should write to petitioner's insurance department for more information. These advertisements, however, did not mention either Maryland Casualty or the broker, the Planning Corporation. In addition, in petitioner's application for membership for new members, petitioner listed, as one of the direct benefits of membership, the special insurance plans available through petitioner, including life, errors and omissions, disability, health, and industry casualty insurance.

The industry casualty insurance was sold through local independent insurance agents who solicited clients, collected the premiums, and handled the claims under the policy. The Planning Corporation was the insurance brokerage company responsible for managing and monitoring the safety dividend casualty program. In addition to its agreement with Maryland Casualty, petitioner also had administrative functions it performed with respect to the Planning Corporation. When the executive vice president of the Planning Corporation enumerated these administrative duties performed by petitioner, he referred to petitioner's involvement in the insurance plan as extensive and becoming more extensive as the program grew. Petitioner provided editorial assistance on articles and advertisements for the insurance in the Water Well Journal and the Well Log, sales assistance at all expositions, reports to petitioner's board of directors regarding the progress of the insurance program, loss review and analysis based on quarterly loss reports that were sent to petitioner, continuous sales and education efforts by petitioner's director of membership relations, continuous communication with the broker regarding the day-to-day operation of all aspects of the insurance program, establishment and continued operation of the safety committee, and accounting and individual distribution of annual dividends.

In 1980, petitioner employed one employee who was responsible for answering inquiries and providing information about the insurance program. This employee answered mail and telephone inquiries, provided packets of information to those who asked for them, and referred people to

either their local insurance agent, the Planning Corporation, or Maryland Casualty. This employee was hired by petitioner and did not personally receive any compensation or commissions from Maryland Casualty or the Planning Corporation for performing these services.

The record does not indicate when the Maryland Casualty industry casualty insurance program was first established. However, the executive vice president of the Planning Corporation described petitioner's industry casualty insurance program as "one of the few of it's [sic] type that has been dynamically successful over a considerable period of time."[3]

During the taxable year ending October 31, 1980, approximately 400 persons (individuals or companies) were covered by insurance under petitioners safety dividend casualty program. Out of these 400, approximately 240 were members of petitioner.

During its fiscal year ended October 31, 1980, petitioner received a dividend of $271,293 from Maryland Casualty under the industry casualty insurance program related to the policy year ended May 31, 1979. This dividend was computed as follows:

| | |
|---|---|
| Total premiums paid to Maryland Casualty | $2,351,362 |
| Losses and expenses of Maryland Casualty | (1,995,077) |
| Contingency reserve | (84,992) |
| Dividend | 271,293 |

In sponsoring the various insurance programs, petitioner only received payments under the industry casualty insurance program, and it is only those payments received under the industry casualty insurance program which are at issue in this case.

Petitioner was under no obligation to distribute the Maryland Casualty dividend to the individual members insured under the group policy.[4] Petitioner's board of

---

[3]In petitioner's "Statement of Income and Changes in Fund Balance," petitioner listed group insurance dividends of $47,493 and $72,172 as income in the years ending Oct. 31, 1977 and 1978, respectively. However, it is not wholly clear whether this was income from the industry casualty insurance program. For the 6 months ended Apr. 30, 1979, petitioner's statement of earnings reflected income from "GROUP INS MANAGE FEE" of $93,580.75. Again it is not wholly clear whether this was income from the industry casualty insurance program involved in this case.

[4]It is not entirely clear from par. 20 of the parties' stipulation whether dividends were distributed just to those insured persons under the group policy who were members of petitioner or to all insured persons, whether members or nonmembers. If petitioner retained all

directors, however, decided to distribute $154,105 of the dividend to those insured under the group policy on a pro rata basis based on the percentage of the total premium that each had paid.

Petitioner retained the remaining $117,188 of the dividend. A portion of the retained dividend was used by petitioner's safety committee during the fiscal year ended October 31, 1980. The purpose of the safety committee was to promote safety in the water well industry through educational programs and publications. The safety committee used part of this dividend to publish a safety manual entitled "Manual of Recommended Safe Operating Procedures and Guidelines for Water Well Contractors and Pump Installers." This manual was the primary activity of the safety committee that year.

By statutory notice of deficiency dated June 10, 1983, respondent determined that the net dividend retained by petitioner was taxable as unrelated business income that should have been reported on an Exempt Organization Business Income Tax Return or Form 990-T. Petitioner did not file a Form 990-T. Respondent allowed the expenses related to the publication of the manual that the safety committee published, allowable deductions related to the insurance dividend income, and dividends paid to policyholders as a deduction from the gross insurance dividends petitioner received. Thus, respondent determined a deficiency in Federal income tax of $21,082 based upon net unrelated business income in the amount of $86,830, the net dividend petitioner retained.

I

UNRELATED BUSINESS TAXABLE INCOME

Respondent contends that the net dividend that petitioner received from the Maryland Casualty group industry casualty insurance policy is unrelated business taxable income. Petitioner claims that the dividend is not unrelated business taxable income because the activity from which the divi-

---

of the dividends pertaining to nonmembers, that might be a factor indicating unrelated business income; if, as we assume for purposes of this case, petitioner made a pro rata distribution of a portion of the dividends to all those insured under the group policy, whether members or nonmembers, that would be a neutral factor in our determination in this case.

dend was derived is not a trade or business, or if it was a trade or business, the activity was substantially related to petitioner's exempt purpose. If income derived from the group insurance program is found to constitute unrelated business taxable income, petitioner argues that it constitutes a royalty payment and is therefore excluded from the tax on unrelated business taxable income.

Petitioner is exempt from taxation under section 501(a) as a business league under section 501(c)(6). Section 511(a), however, imposes a tax on the "unrelated business taxable income" of the various exempt organizations, including the various categories under section 501(c). Unrelated business taxable income or UBTI is defined in section 512(a) as "the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business." Section 513(a), in turn, defines "unrelated trade or business" as:

any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 * * *

Closely tracking the above statutory provisions, the regulations and the case law have delineated the three elements necessary for income from an activity to constitute unrelated business taxable income: (1) The activity from which the income is derived is a trade or business, (2) the trade or business is regularly carried on by the organization, and (3) the conduct of the trade or business is not substantially related (other than through the need for or use of the funds produced) to the organization's tax-exempt purpose. Sec. 1.513-1(a), Income Tax Regs.; *United States v. American Bar Endowment*, 477 U.S. 105, 110 (1986); *United States v. American College of Physicians*, 475 U.S. 834, 838-839 (1986); *West Virginia State Medical Association v. Commissioner*, 91 T.C. 651 (1988); *Professional Insurance Agents of Michigan v. Commissioner*, 78 T.C. 246, 257-258 (1982), affd. 726 F.2d 1097 (6th Cir. 1984). UBTI exists only if all three elements are found. *Veterans of Foreign Wars,*

*Department of Michigan v. Commissioner,* 89 T.C. 7, 19-20 (1987). In this case, since there apparently is no dispute that petitioner's activities in regard to the industry casualty insurance program were regularly carried on, the income is UBTI if such activities constitute a trade or business and the conduct of such trade or business is not substantially related to petitioner's tax-exempt purpose as a business league.

Section 513(c)[5] defines the term "trade or business" as any activity that is carried on for the production of income from the sale of goods or the performance of services. The regulations provide that, as a general rule, an activity that qualifies as a trade or business under section 162[6] also qualifies as a trade or business under section 513. Sec. 1.513-1(b), Income Tax Regs.[7] The test for a trade or business under section 162 is whether the taxpayer is engaged in the activity with continuity and regularity and whether the taxpayer's primary purpose for engaging in the activity is for income or profit. *Commissioner v.*

[5]SEC. 513. UNRELATED TRADE OR BUSINESS

(c) ADVERTISING, ETC., ACTIVITIES.—For purposes of this section, the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. Where an activity carried on for profit constitutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit.

[6]Sec. 162 permits a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business."

[7]Sec. 1.513-1(b), Income Tax Regs., provides in pertinent part as follows:

(b) *Trade or business.* The primary objective of adoption of the unrelated business income tax was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which they compete. * * * However, in general, any activity of a section 511 organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of section 162— and which, in addition, is not substantially related to the performance of exempt functions— presents sufficient likelihood of unfair competition to be within the policy of the tax. Accordingly, for purposes of section 513 the term "trade or business" has the same meaning it has in section 162, and generally includes any activity carried on for the production of income from the sale of goods or performance of services. Thus, the term "trade or business" in section 513 is not limited to integrated aggregates of assets, activities and good will which comprise businesses for the purposes of certain other provisions of the Internal Revenue Code. Activities of producing or distributing goods or performing services from which a particular amount of gross income is derived do not lose identity as trade or business merely because they are carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. * * * However, where an activity carried on for the production of income constitutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit.

*Groetzinger,* 480 U.S. 23 (1987), affg. 771 F.2d 269 (7th Cir. 1985), affg. 82 T.C. 793 (1984);[8] *Brannen v. Commissioner,* 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); *Hager v. Commissioner,* 76 T.C. 759, 784 (1981). In UBTI cases, this test has often been referred to by the shorthand term, the profit motive test.

A similar, if not identical, test that has been applied in UBTI cases is "the competitive, commercial manner" test applied by the U.S. Court of Appeals for the Federal Circuit and its predecessor, the former U.S. Court of Claims. Under the competitive, commercial manner test, an activity is a trade or business for purposes of the tax on UBTI if the exempt organization operates the activity in a competitive, commercial manner or similar to a profit-making enterprise. *American Bar Endowment v. United States,* 761 F.2d 1573, 1576-1577 (Fed. Cir. 1985), revd. 477 U.S. 105 (1986); *Disabled American Veterans v. United States,* 650 F.2d 1178, 1186-1187 (Ct. Cl. 1981). After the Supreme Court reversed the Federal Circuit in *United States v. American Bar Endowment,* 477 U.S. 105 (1986), other courts have generally applied the profit motive test as the proper test. *Fraternal Order of Police Illinois State Troopers Lodge No. 41 v. Commissioner,* 833 F.2d 717 (7th Cir. 1987), affg. 87 T.C. 747 (1986); *Illinois Association of Professional Insurance Agents v. Commissioner,* 801 F.2d 987 (7th Cir. 1986), affg. a Memorandum Opinion of this Court.[9] Even before the Supreme Court's opinion in the *American Bar Endowment* case, several Courts of Appeals had adopted the profit motive test in UBTI cases involving business leagues, such as petitioner, and the Supreme Court, in *American Bar Endowment,* cited that line of cases with approval. 477 U.S. at 110 n. 1, 115 n. 3. Sometimes the competitive, commercial manner test also seems to be referred to as the unfair

---

[8] In *Commissioner v. Groetzinger,* 480 U.S. 23 (1987), the Supreme Court referred to "the Code's wide utilization in various contexts of the term 'trade or business,' * * *" and the absence of an all-purpose definition in the Code or regulations. 480 U.S. at 27. Thus, the Supreme Court held that the resolution of whether an activity was a trade or business would depend on an examination of the facts in each case. 480 U.S. at 36. For sec. 162 the Supreme Court held that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." 480 U.S. at 35-36. The Supreme Court refused to formulate and impose a test for all of the references to a trade or business in the Code, but, instead left any revision of the definition to the Congress. 480 U.S. at 36.

[9] T.C. Memo. 1985-105.

competition test and juxtaposed to the profit motive test. Whether this is the same or a slightly different formulation of the test, both the Supreme Court's *American Bar Endowment* opinion and subsequent case law have made it clear that unfair competition is just one factor to consider and these various linguistic formulations of the profit motive test are not necessarily inconsistent. *Fraternal Order of Police Illinois State Troopers Lodge No. 41 v. Commissioner, supra,* 833 F.2d at 722-723; *Illinois Association of Professional Insurance Agents v. Commissioner, supra,* 801 F.2d at 991 n. 4.

This Court has held that the profit motive test under section 162 also applies to the question of whether an activity constitutes a trade or business for purposes of the tax on UBTI. *West Virginia State Medical Association v. Commissioner, supra; Veterans of Foreign Wars, Department of Michigan v. Commissioner, supra,* 89 T.C. at 20-21; *Professional Insurance Agents of Michigan v. Commissioner, supra,* 78 T.C. at 262-264, affd. on this issue 726 F.2d at 1102. Under the profit motive test, if an organization's motive or intent for engaging in an activity is the production of income, then that activity constitutes a trade or business. *Carolinas Farm & Power Equipment Dealers v. United States,* 699 F.2d 167, 169 (4th Cir. 1983); *Louisiana Credit Union League v. United States,* 693 F.2d 525, 532 (5th Cir. 1982); *Professional Insurance Agents of Michigan v. Commissioner, supra,* 78 T.C. at 262, affd. on this issue 726 F.2d at 1102.

In *Professional Insurance Agents of Michigan v. Commissioner, supra,* this Court held that a business league, exempt under section 501(c)(6), that endorsed and promoted several different group insurance programs underwritten by private insurance companies was subject to the tax on UBTI. These insurance programs included a group health policy, a life insurance policy, and an errors and omissions liability policy. The taxpayer also sponsored a master group insurance policy with Time Insurance Co. The master group insurance policy permitted the insurance company to main-

tain an "experience rating reserve"[10] with the taxpayer serving as the master policyholder. The taxpayer performed administrative services with regard to all of the programs, including putting brochures describing the programs in the taxpayer's membership packets, promoting the programs at educational seminars and in the taxpayer's official magazine, answering telephone inquiries concerning the programs, and reviewing all claims for submission to the insurance company's claims department. The taxpayer received fees ranging from 4 to 8 percent of the premiums paid by its members for the group health, life, and errors and omissions insurance. At trial, the taxpayer's executive vice president testified that if the insurance company had not paid those fees, he would have recommended to the taxpayer's board that it discontinue its endorsement of those insurance programs and look for other programs to endorse and promote.

In *Professional Insurance Agents of Michigan v. Commissioner, supra,* the taxpayer also received a refund when it notified Time Insurance Co., the insurer of the experience rating reserve policy, that it was canceling the policy. Time Insurance agreed to refund any remaining experience rating reserve to the taxpayer, as master policyholder, after all claims arising under the policy prior to the termination date were settled. When the taxpayer received this refund, it did not distribute any of the funds to its members but deposited the funds into the organization's account along with the fees received from the other insurance policies.

In *Professional Insurance Agents of Michigan v. Commissioner, supra,* this Court concluded that the taxpayer's activities with regard to both the insurance producing the fee percentages and the insurance producing the experience rating reserve refund reflected an intent to seek a profit. 78 T.C. at 262-263. The Court based this conclusion on the fact that the taxpayer's promotional activities were highly profitable, generating revenues far in excess of the related expenses and services provided by the taxpayer, and that although the risk to the taxpayer was small, the taxpayer

---

[10]The experience rating reserve is a percentage of premium payments set aside to protect the insurance company against larger than anticipated losses. If the losses do not materialize the insurance company refunds the reserve to the master policyholder.

could earn a great deal as the insurance program became widespread. 78 T.C. at 262. The Court also pointed out that the executive vice president's testimony that he would have recommended a different insurance program if the taxpayer had not been sufficiently compensated was further proof that the taxpayer's purpose in promoting and endorsing the insurance was to earn a profit. 78 T.C. at 262.

In *Professional Insurance Agents of Michigan v. Commissioner, supra*, the executive vice president's testimony furnished direct but entirely subjective evidence of the organization's intent to earn a profit. Usually, however, there is no direct evidence of such subjective intent, nor is it required. As in other areas of the law involving profit motive, or more properly speaking profit objective, the courts base their conclusions on all of the facts and circumstances, i.e., on the totality of the objective factors rather than on a person's mere statement of subjective intent.[11] In the *Professional Insurance Agents of Michigan* case, this Court relied primarily on the perhaps more indirect but nonetheless more objective evidence of a profit motive, including the fact that the activity was highly profitable and little risk was involved.

Other courts have held that circumstantial evidence alone may demonstrate an intent to make a profit. In *Louisiana Credit Union League v. United States, supra*, 693 F.2d at 533, the Fifth Circuit found that a profit motive existed based on the fact that the taxpayer was extensively involved in endorsing and administering the insurance program that proved highly profitable. The League selected the companies whose products and services would be endorsed, actively marketed and promoted those products and services to its members, and performed necessary day-to-day administrative tasks. In return, the taxpayer

---

[11]For example, the nine factors under the sec. 183 regulations, which are often used to determine profit motive or profit objective, simply represent a compilation of factors distilled from the case law. Sec. 1.183-2(b), Income Tax Regs. No single one of these factors is determinative, and the various objective factors are accorded more weight than a person's mere statement of subjective intent. In the area of tax shelters, this Court considered at length this matter of using objective factors to prove subjective intent and has developed a unified approach emphasizing objective factors for generic tax shelters. *Rose v. Commissioner*, 88 T.C. 386 (1987). However, the use of objective factors to prove profit motive or profit objective has never been restricted to just tax shelters and applies to issues as to whether or not a taxpayer is engaged in a trade or business. *Elliott v. Commissioner,T1 90 T.C. 960 (1988); Jenkins v. Commissioner*, T.C. Memo. 1988-292.

was amply rewarded with the profits from the insurance program that increased each year. 693 F.2d at 533. Similarly, in *Fraternal Order of Police Illinois State Troopers Lodge No. 41 v. Commissioner,* 87 T.C. 747 (1986), affd. 833 F.2d 717 (7th Cir. 1987), while primarily addressing the special problem of paid advertising as a separate trade or business, this Court also noted that the taxpayer's advertising activities were "obviously conducted with a profit motive" since the advertising activities were so lucrative and with no risk or expense for the organization. 87 T.C. at 756.

In *Carolinas Farm & Power Equipment Dealers v. United States, supra,* the Fourth Circuit found that strong evidence of a profit motive existed since the taxpayer "consistently received far more in rebates than it expended in providing insurance services." 699 F.2d at 170. In doing so, the Fourth Circuit followed the Fifth Circuit and this Court, pointing out that "there is no better objective measure of an organization's motive for conducting an activity than the ends it achieves." 699 F.2d at 170. The Fourth Circuit also indicated that "strong evidence" of a profit motive can be found by implication if the income-producing activity is not substantially related to the organization's tax-exempt purpose. 699 F.2d at 170-171. Finally, the Fourth Circuit pointed out that if the income-producing activity that is not substantially related to the tax-exempt purpose "is conducted in a competitive profit-seeking manner and regularly earns significant profits, a heavy burden must be placed on the organization to prove profit is not its motive." 699 F.2d at 171. The Fourth Circuit further concluded that where "an organization could easily rebate any profits to its members and thus * * * provid[e] them with even lower cost group insurance," that burden has not been met, thus holding that the activity was undertaken for profit. 699 F.2d at 171.

The Supreme Court in *United States v. American Bar Endowment, supra,* held that an insurance program sponsored by an exempt charitable organization was a trade or business for purposes of the tax on UBTI. 477 U.S. at 119. The taxpayer offered experience rating reserve group insurance policies to its members. The insurance company agreed to refund the excess premiums paid if the insurance

company's actual cost of providing the insurance to the group was lower than the premium paid. Since the taxpayer's members had favorable mortality and morbidity rates, the cost of providing experience-rated insurance was less than insurance based on general actuarial tables. The taxpayer, however, priced the policies competitively with other insurance policies offered to the public to generate large dividends. As part of its fund-raising program, the taxpayer required its members to agree, as a condition of participating in the group insurance program, to allow the taxpayer to retain all of the dividends rather than distributing them pro rata to the insured members.

In *United States v. American Bar Endowment, supra,* the taxpayer's participation in the insurance program included compiling lists of its members, soliciting its members, collecting the premiums, transmitting the premiums to the insurer, maintaining a file on each policyholder, answering members' questions concerning the policies, and screening claims for benefits. The Supreme Court held that the taxpayer's activities in regard to the insurance program constituted a trade or business. 477 U.S. at 119. The Supreme Court cited, with approval, *Professional Insurance Agents of Michigan v. Commissioner,* 726 F.2d 1097 (6th Cir. 1984), affg. 78 T.C. 246 (1982); *Carolinas Farm & Power Equipment Dealers v. United States, supra;* and *Louisiana Credit Union League v. United States, supra,* and the profit motive test applied by these courts. 477 U.S. at 110 n. 1. The Supreme Court further stated that the distinction between business leagues, such as were involved in those cases, and charities, such as the taxpayer in that case, was insubstantial in determining whether an activity conducted by the organization was a trade or business. 477 U.S. at 115 n. 3. The only issue presented to the Supreme Court in the *American Bar Endowment* case was whether or not the insurance activity constituted a trade or business.

In its trade or business determination, the Supreme Court also pointed out that the income from the insurance program constituted UBTI because the taxpayer unfairly competed with other insurance companies. *United States v. American Bar Endowment, supra,* 477 U.S. at 114. The Supreme Court noted that the original purpose of the

unrelated business income tax was "to prevent tax-exempt organizations from competing unfairly with businesses whose earnings were taxed."[12] 477 U.S. at 114. The Supreme Court held that the facts in the case represented "precisely the sort of unfair competition that Congress intended to prevent" since private commercial entities could have provided the same services for the insurance program that were provided by the taxpayer. 477 U.S. at 114. However, if as the taxpayer contended, the taxpayer's members could deduct part of their premiums as a charitable contribution and the taxpayer did not have to pay any tax on the income from the insurance program, the taxpayer had an unfair advantage over private commercial entities. 477 U.S. at 114-115. Although the Federal Circuit in *United States v. American Bar Endowment, supra,* had rejected the unfair competition argument, failing to find any taxable entities with whom the taxpayer was in actual competition, the Supreme Court concluded that the Court could presume that a specific entity did or could possibly exist that was in competition with the taxpayer. 477 U.S. at 115. The Supreme Court noted that presumably the taxpayer's members belonged to other organizations that offered group insurance policies, such as trade associations and financial services, that are taxed on their profits and whose policyholders may not deduct any part of the premiums. 477 U.S. at 115. The Supreme Court held that to find unfair competition, a court need not have evidence of a specific nonexempt organization with whom the exempt organization competes. In other words, the exempt organization need not actually compete, and it is sufficient unfair competition if it may potentially compete with nonexempt organizations. 477 U.S. at 115.

Under the profit motive test, and weighing all of the objective facts and circumstances, we find that petitioner's

[12]The regulations note that one of the reasons Congress imposed a tax on UBTI was to eliminate a source of unfair competition between exempt organizations with their unrelated business activities and nonexempt businesses. Sec. 1.513-1(b), Income Tax Regs. See H. Rept. 2319, 81st Cong., 2d Sess. 36-37 (1950), 1950-2 C.B. 380, 408-409; S. Rept. 2375, 81st Cong., 2d Sess. 28-30 (1950), 1950-2 C.B. 483, 503-506. The regulations provide for a presumption of unfair competition when an activity carried on for the production of income possesses the characteristics required to constitute a "trade or business" within the meaning of sec. 162, and is not substantially related to the performance of exempt functions. Sec. 1.513-1(b), Income Tax Regs.

active participation in the industry casualty insurance program constituted a trade or business under section 513. The facts in this case are quite similar to the facts in *Professional Insurance Agents of Michigan v. Commissioner, supra,* in which both this Court and the Sixth Circuit held that the taxpayer's activities in regard to the insurance program constituted a trade or business. 78 T.C. at 262: 726 F.2d at 1102. In this case petitioner received a dividend similar to the taxpayer's receipt of the experience reserve refund in *Professional Insurance Agents of Michigan v. Commissioner, supra.* Petitioner also performed administrative services for the insurance program, similar to those performed by the taxpayer in that case, as well as endorsing and promoting the insurance program to its members. Petitioner did not have a specific agreement with Maryland Casualty as to the amount petitioner would receive, as was the case with the fee percentages in *Professional Insurance Agents of Michigan v. Commissioner, supra.* However, we conclude that a contractual right to receive commissions or fees is not necessary to a finding of a profit motive.[13] As in the case of *Louisiana Credit Union League v. United States, supra,* we conclude that the profit motive can be inferred in this case from the objective facts that petitioner was extensively involved in endorsing and administering a program that proved highly profitable for petitioner. Maryland Casualty developed a comprehensive industry casualty insurance program for water well drillers. In agreeing to sponsor and promote that insurance program, petitioner provided Maryland Casualty with its membership lists, wrote articles on safety and its effects on insurance, provided exhibit space for Maryland Casualty at its conventions and meetings, and employed someone, who was not compensated by the insurer, to answer inquiries regarding the insurance. Additionally, petitioner placed advertisements for the insurance in its journals, which advertisements did not mention the insurer, Maryland Casualty, or the broker, the Planning Corporation, and which directed the reader to contact petitioner for further

---

[13]In *Professional Insurance Agents of Washington v. Commissioner,* T.C. Memo. 1987-68, this Court found that the taxpayer's participation in promoting insurance was critical to the success of the program, and the fact that the taxpayer had no contractual right to receive any insurance commissions did not negate the compensatory nature of the fees it received.

information. As a selling point in its application for new members, petitioner listed the industry casualty insurance program as one of the direct benefits of membership in the organization.

Petitioner also performed extensive administrative duties for the broker of the insurance program, the Planning Corporation. The executive vice president of the Planning Corporation attributes part of the success of petitioner's industry casualty insurance program over a considerable period of time to petitioner's extensive and growing involvement with the program. Petitioner's administrative services to Maryland Casualty and/or the Planning Corporation included providing editorial assistance for advertisements in petitioner's journals, sales assistance at expositions, reports to petitioner's board of directors regarding the program, continuous communication with the broker regarding the day-to-day operation of all aspects of the insurance program, and accounting and individual distribution of annual dividends. In return for petitioner's efforts to aid Maryland Casualty and the Planning Corporation, in 1980 petitioner received a dividend of $271,293, of which petitioner retained $117,188. See n. 4, *supra.*

With regard to the factor of unfair competition, the record does not disclose whether other insurance companies had industry casualty insurance plans available only to water well drillers or other types of insurance suitable for the water well industry. However, petitioner's agreement with Maryland Casualty specified that petitioner would not sponsor or endorse any other property or casualty insurance program nor allow its list of property or casualty insured risks to be disseminated to other parties for purposes of direct or indirect solicitation for any other property or casualty insurance program. This strongly suggests there were or at least potentially could have been other insurance companies with competing insurance products, but for the monopoly that petitioner agreed to try to create for Maryland Casualty. Under *United States v. American Bar Endowment, supra,* this actual or potential unfair competition with nonexempt business organizations suffices. Thus, to the extent that unfair competition is a factor to consider in determining the existence of trade or business, we find

that petitioner could unfairly compete with taxable commercial organizations that could provide petitioner's members and others in the water well industry with casualty insurance, but which would be taxed on their profits. This factor bolsters our conclusion that petitioner's activities constituted a trade or business.

Our next inquiry is whether petitioner's conduct of that trade or business was substantially related to its exempt purposes as a business league. The final element of an unrelated trade or business is that the activity that produces the income does not bear a substantial relationship to the organization's tax-exempt purposes. Sec. 1.513-1(a), Income Tax Regs. For the substantial relationship requirement to be met, the activity that produces the income "must contribute importantly to the accomplishment of those [exempt] purposes." Sec. 1.513-1(d)(2), Income Tax Regs.[14] An organization, however, cannot use its need for funds or the use it makes of these funds for an organization's exempt purpose to establish that the activity is substantially related to the accomplishment of the organization's exempt purpose. Sec. 1.513-1(d), Income Tax Regs.; *Carolinas Farm & Power Equipment Dealers v. United States, supra,* 699 F.2d at 171; *Disabled American Veterans v. United States, supra,* 650 F.2d at 1189.

The Supreme Court, in *United States v. American College of Physicians,* 475 U.S. 834 (1986), focused on the question of how an organization, exempt under section 501(c)(3),[15] operates or conducts the activity to determine whether the substantial relationship exists. 475 U.S. at 848. The Supreme Court held that the business of selling advertising space in the taxpayer's medical journals was not substantially related to the organization's tax-exempt purpose. 475

---

[14]The regulations describe the type of relationship that qualifies as "substantial":

"Trade or business is 'related' to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is 'substantially related,' for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes * * * [Sec. 1.513-1(d)(2), Income Tax Regs.]"

[15]Sec. 501(c)(3) exempts from taxation entities "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary or educational purposes.'

U.S. at 849-850. Although the taxpayer argued that the advertisements served to educate the organization's members about recent medical developments, which was one of its tax-exempt purposes, the Supreme Court held that it would examine the conduct and intent of the organization rather than the educational impact of the advertisements on the organization's members. 475 U.S. at 848. The Supreme Court found that the taxpayer did not use or intend to use the advertising for the purpose of contributing to the educational value of the journal, since only those willing to pay received space in the journals, and advertisements were often repeated from month to month or were wholly unrelated to the articles in the journal or sometimes unrelated to the purposes of the organization. 475 U.S. at 849. Thus, the Supreme Court found that any educational function that the advertisements might serve was only incidental to its purpose of raising revenue. 475 U.S. at 849.

Following the Supreme Court decision, the Seventh Circuit in *Illinois Association of Professional Insurance Agents v. Commissioner, supra,* 801 F.2d at 995, held that the manner in which the taxpayer, a business league exempt under section 502(c)(6), conducted its errors and omissions insurance activities indicated that the activities were not substantially related to the taxpayer's exempt purpose. The Seventh Circuit based this determination on the fact that the taxpayer endorsed a particular errors and omissions program in a manner that provided convenient marketing, advertising, and administrative services to the insurance company and generated income for the taxpayer rather than educating the taxpayer's members, serving the public interest, or merely advising of the need for such coverage. 801 F.2d at 995. The Seventh Circuit further noted that an indication that a business league's promotion of insurance was not substantially related to its exempt purpose of promoting the common business interests of its members was if it benefited the individuals in direct proportion to the fees they paid, rather than benefiting the members as a group. *Illinois Association of Professional Insurance Agents v. Commissioner, supra,* 801 F.2d at 996.

The pertinent regulations also provide that a business league's exempt activities "should be directed to the

improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons." Sec. 1.501(c)(6)-1, Income Tax Regs. Several courts have held that the activities that generate the income must benefit the members as a group rather than in their individual capacities. *Professional Insurance Agents of Michigan v. Commissioner, supra,* 726 F.2d at 1103;[16] *Carolinas Farm & Power Equipment Dealers Association, Inc. v. United States, supra,* 699 F.2d at 171; *Louisiana Credit Union League v. United States, supra,* 693 F.2d at 535. On the other hand, an activity is considered tax exempt when it does not assure each member that he will receive benefits that are directly proportional to the fees he pays, such as lobbying services or educational seminars. *Professional Insurance Agents of Michigan v. Commissioner, supra,* 726 F.2d at 1104; *Steamship Trade Association of Baltimore, Inc. v. Commissioner,* 757 F.2d 1494, 1498 (4th Cir. 1985), affg. 81 T.C. 303 (1983). In other words, the activity must benefit the common business interest of the membership or industry as a whole and not just benefit individual persons in their individual capacities.

The Supreme Court in *United States v. American College of Physicians, supra,* had no reason to address whether the members received the benefits in a group or an individual capacity. The activity there was paid advertising in the organization's journal. The exempt organization in that case was one that was organized and operated exclusively to further charitable, educational, religious, and other purposes, which are aimed at benefiting the community as a whole under section 501(c)(3). On the other hand, business leagues under section 502(c)(6) are operated solely to promote some common business interest of persons having a common business interest. The regulations specifically note that business leagues under section 501(c)(6) distinguish the improvement of business conditions for its members from "the performance of particular services for individual persons." Sec. 1.501(c)(6)-1, Income Tax Regs. Thus, we con-

---

[16]The Sixth Circuit delineated a two-part test. *Professional Insurance Agents of Michigan v. Commissioner,* 726 F.2d 1097, 1103 (6th Cir. 1984). The court held that whether a substantial relationship exists depends on (1) the unique nature of the activities vis-à-vis the organization's function, and (2) the capacity in which benefits are received by the organization's members. 726 F.2d at 1103.

clude that the proper test is that a substantial relationship to the exempt purpose does not exist if the business league's activity includes only the performance of particular services for individuals in proportion to the money they pay, as stated in *Professional Insurance Agents of Michigan v. Commissioner*, 78 T.C. 246 (1982), affd. 726 F.2d 1097 (6th Cir. 1984). The Supreme Court's opinion in *United States v. American College of Physicians, supra*, with its emphasis on how the organization conducts the activity, does not change this test and is entirely consistent with it.

In this case, petitioner's exempt purpose under section 501(c)(6) is to assist, promote, encourage, and support the interests and welfare of the water well industry, educate the public about the role of the water well industry in the economy of the nation, and advance the mutual interests of all those engaged in the water well industry. We find that petitioner's endorsement and sponsorship of the industry casualty insurance program was not substantially related to its exempt purposes. Under the conduct test applied by the Supreme Court in *United States v. American College of Physicians, supra*, in earlier years petitioner initially may have intended to benefit and promote the water well industry when petitioner conducted a study and sought to separate water well drillers from oil well drillers for insurance purposes. After the industry casualty insurance policy was developed by Maryland Casualty, however, petitioner's role in that insurance program no longer supported or advanced the interests of its members or the water well industry as a group. As in *Illinois Association of Professional Insurance Agents, Inc. v. Commissioner, supra*, petitioner provided marketing, advertising, and administrative services for one particular insurance program that generated income for petitioner. Petitioner's endorsement and promotion of the safety dividend insurance program, which included setting aside exhibit space at petitioner's conventions and placing advertisements in petitioner's journals, was only for the insurance program sponsored by petitioner.

If petitioner had intended to support the mutual interests and welfare of the water well industry, petitioner would have conducted its activities in such a way to reflect this.

Petitioner would not have selected only one insurance company to promote and advertise at its conventions and in its journals. If petitioner had intended to educate and advise its members of the need for casualty industry insurance, petitioner might have advised its members of various types of insurance from which its members could select. In addition, if petitioner wanted solely to aid those in the water well industry with its insurance program, petitioner would not have arranged for petitioner to receive all of the experience dividends and be able to select who would receive the dividend. Petitioner did not educate the water well industry, serve the public interest, or advise industry members of the need for such insurance by endorsing and sponsoring only insurance from Maryland Casualty. As the Seventh Circuit stated in *Illinois Association of Professional Insurance Agents, Inc. v. Commissioner, supra,* 801 F.2d at 994: Where services and goods are available in the marketplace, "a trade association need not provide it to accomplish an exempt purpose." *Carolinas Farm,* 699 F.2d at 172.

Petitioner argues that one of the obligations it agreed to perform for Maryland Casualty while endorsing the insurance program, writing articles on safety and its effects on insurance, indicates that petitioner's activity was substantially related to its exempt purpose. Petitioner agreed to write articles on safety and its effects on insurance as part of petitioner's fulfillment of its written agreement with Maryland Casualty in which petitioner also agreed to provide the insurance company with its membership lists. Any exempt purpose this might have served was only incidental to petitioner's purpose of fulfilling its contractual obligation to Maryland Casualty and enhancing the favorable safety experience, and hence the amount of dividends it received, under the safety dividend insurance program.

Since petitioner is a business league exempt under section 501(c)(6), petitioner's insurance program must benefit the industry as a whole rather than the members in their individual capacities.[17] In this case, only those individuals

---

[17]Petitioner also argues that a third factor set forth in *Carolinas Farm & Power Equipment Dealers v. United States, supra,* to determine whether an activity is substantially related, should be applied in this case. In that case, the Fourth Circuit pointed out that, in addition to determining if the fees charged to members are in direct proportion to the benefits received by

who paid premiums received insurance under the industry casualty insurance program. Petitioner argues that its activities served to educate all of its members as to the importance of and the necessity for continuing efforts to develop water well safety. Any benefits petitioner's nonsubscribing members may have received were only incidental to petitioner's efforts to endorse and sponsor its industry casualty insurance program.[18] The fact that petitioner's members may have received an indirect benefit through petitioner's use of the retained dividend funds to promote safety in the water well industry is of no consequence since the use an organization makes of the funds it receives cannot be used to prove that an activity is substantially related to the organization's exempt purpose.[19] *Carolinas Farm & Power Equipment Dealers v. United States, supra,* 699 F.2d at 171. Thus, under the conduct test in *United States v. American College of Physicians, supra,* and the individual benefits test for business leagues, petitioner's endorsement or sponsorship of the insurance program is not substantially related to petitioner's exempt purposes. Thus, we find that petitioner's income from the activity is taxable as UBTI.

## II

### ROYALTIES

Finally, petitioner contends that even if the dividends are held to be UBTI, the dividends should nonetheless be excluded from taxation under section 512(b)(2) as royalties. Section 512(a)(1) specifies that certain "modifications" in

---

the members and whether nonexempt organizations also provide the service offered by the exempt organization, the fact that participation in the activity is limited to members of the organization and so is of no benefit to nonmembers shows that it does not benefit the industry as a whole. 699 F.2d at 171. Here, of course, the industry casualty insurance program was open to nonmembers. 699 F.2d at 171. However, we have held that the distinction between insurance open only to members and that open to everyone is of little significance. *Professional Insurance Agents of Washington v. Commissioner,* T.C. Memo. 1987-68 n.3. We find that this is a neutral factor in our determination in this case. See note 4, *supra.*

[18]The fact that a group insurance plan is available does not mean that the common business conditions of those who work in the business league's industry also improve. *Long Island Gasoline Retailers Association, Inc. v. Commissioner,* T.C. Memo. 1982-136. Only those who subscribe to the insurance plan receive any benefits.

[19]We note, however, that respondent nonetheless allowed petitioner a deduction for that portion of the dividend that was used by petitioner's safety committee to publish a safety manual.

section 512(b) are considered when computing an organization's UBTI. Section 512(b)(2) provides that one of these modifications referred to in section 512(a) is that royalties are not taken into account when determining an organization's UBTI.

Whether an item of income constitutes a royalty is to be determined from all of the facts and circumstances in each case. Sec. 1.512(b)-1, Income Tax Regs. Petitioner has the burden of proof on this issue. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).

Generally a royalty is a payment for the use of a valuable right such as a trademark, trade name, service mark, or copyright, regardless of whether the property represented by the right is used; royalties also include the right to a share of production reserved to the owner of property for permitting another to work mines and quarries or drill for oil or gas. *Fraternal Order of Police Illinois State Troopers Lodge No. 41 v. Commissioner, supra,* 833 F.2d at 723, affg. on this issue 87 T.C. at 747; *Disabled American Veterans v. United States, supra.* In the latter case, the Court of Claims held that royalties also are payments "which constitute passive income, such as the compensation paid by a licensee to the licenser for the use of the licenser's patented invention." 650 F.2d at 1189. In *Fraternal Order of Police Illinois State Troopers Lodge No. 41 v. Commissioner,* 87 T.C. 747, 758 (1986), affd. 833 F.2d 717 (7th Cir. 1987), this Court held that the taxpayer's income from advertisements in its magazine was not royalty income since the taxpayer's role in the publication of the magazine was not passive.

In this case, petitioner argues that the income it received from Maryland Casualty was royalty income because petitioner's activities with respect to the industry casualty insurance program were passive. The facts are otherwise. Petitioner's role was most active. Petitioner performed administrative and advertising services for the insurance company and, in exchange, received a refund from the experience dividends. Petitioner's duties included, among other things, providing the insurance company with its membership lists, writing articles on safety and its effects on insurance, providing exhibit space at its conventions and meetings for the insurance program, placing advertisements

in its journals for the insurance program, as well as providing an employee of petitioner who was responsible for mailing out and otherwise distributing information concerning the insurance. These extensive services performed by petitioner demonstrate that petitioner played an active role in the insurance program. The income petitioner received was not passive income but more akin to compensation for services rendered and so was not royalty income.

Thus, the income petitioner received for its endorsement and sponsorship of the industry casualty insurance program constituted income from a trade or business the conduct of which was not substantially related to its exempt purpose and as such is taxable as unrelated business taxable income or UBTI.

*Decision will be entered for the respondent.*