NATIONAL ASSOCIATION OF LIFE UNDERWRITERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
National Ass'n of Life Underwriters v. Commissioner
Docket No. 13612-90
United States Tax Court
T.C. Memo 1992-442; 1992 Tax Ct. Memo LEXIS 466; 64 T.C.M. (CCH) 379; August 5, 1992, Filed As Corrected August 17, 1992. *466 Decision will be entered under Rule 155. For Petitioner: Joseph Greif and Leonard J. Henzke, Jr.
For Respondent: Dianne I. Crosby. KORNER
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: By statutory notice of deficiency dated April 25, 1990, respondent determined deficiencies in petitioner's unrelated business income tax for tax years ended August 31, 1981, 1982, and 1983, in the amounts of $ 151,344, $ 288,153, and $ 376,967, respectively. The issues for decision are: (1) Whether respondent erred in determining that a portion of petitioner's circulation income from its periodical must be determined under section 1.512(a)-1(f)(4)(iii), Income Tax Regs.; (2) whether respondent erred in determining the amounts of direct advertising costs and readership costs associated with the production of petitioner's periodical; (3) whether petitioner may deduct from its unrelated business income losses that it allegedly incurred in a professional liability program; (4) whether petitioner is entitled to more investment tax credits than determined by respondent; and (5) whether, during the years at issue, petitioner may deduct District of Columbia unrelated *467 business income taxes in determining its Federal unrelated business income tax liability. [1]
FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. At the time of filing its petition herein, the National Association of Life Underwriters, Inc. (hereinafter referred to as petitioner or NALU), was a nonprofit corporation with its principal office in Washington, D.C. Petitioner has been exempt from Federal income tax as a business league under section 501(c)(6) [2] since at least 1977. Its particular business or object was to "advance the best interests of the science of true life insurance, and the *468 mutual improvement and education of those engaged in selling scientific life insurance". Petitioner's activities included promoting insurance legislation and regulations in the public interest, disseminating information, and working to improve the ways insurance helps the public. Petitioner filed its Federal income tax returns on the basis of a fiscal year ending August 31 and used the accrual method of accounting. Organization
Petitioner was established in 1890 as a federation of local associations by its founding members, 14 local life underwriter associations, to serve as their national coordinating body. Its original constitution and bylaws were adopted at that time. Petitioner was incorporated as a nonprofit District of Columbia corporation on August 5, 1921. During the period at issue, a 1979 version *469 (from 1979 to 1983) and a 1983 version (from 1983 on) of petitioner's bylaws were in effect. Although substantially identical, the versions do contain some variations. References in this Opinion to petitioner's bylaws shall refer to the 1979 version, and any variations present in the 1983 version will be referred to only when appropriate. Petitioner was a federation of state and local member associations which had been elected to membership and which had agreed to be bound by petitioner's bylaws. Petitioner's bylaws stated that its powers were: (a) To elect associations to membership and to suspend or revoke such membership. (b) To create affiliated units within the structure and under the supervision and control of NALU. Such units, having objects consistent with those of this Association, shall fulfill the needs of certain specialized groups in the membership. (c) To establish the schedule of dues to be paid to NALU by or on behalf of local associations. (d) To manage, supervise, direct and control the business, property, and funds of NALU. (e) To take all actions necessary to carry out the objects of NALU. All other powers were specifically reserved to member *470 associations. State associations performed some of the same functions at the state level that petitioner performed at the national level. The state associations' members consisted of local associations which were also members of petitioner. To obtain a certificate of election in petitioner, local associations had to have complied with the following conditions of petitioner's bylaws: (a) Adopted the standard form for local association bylaws approved by the Board of Trustees, and modified only as approved by the Board. (b) Secured an initial membership of the required number [generally, 25 individuals] * * *. (c) Elected officers, appointed committees and completed association organization as required by the standard form for local association bylaws. (d) Furnished the Executive Vice-President of NALU with a list of its members. (e) Paid to NALU the prorated or annual dues and the magazine subscriptions as required by these Bylaws. Thereafter, each local association was required to submit a list of its members for a calendar year to petitioner by March 1. Local associations were subject to having their membership suspended or revoked for failing to conform to *471 certain of petitioner's bylaws. Petitioner's bylaws provided generally for the structure and governance of the local associations. The local associations' members generally consisted of individuals classified either as active, associate, or honorary. [3] Active local association members generally consisted of qualified individuals engaged in the sale of legal reserve life insurance. Those individuals paid annual membership dues and had full rights and obligations in the association. Associate local association members generally consisted of individuals affiliated in any capacity with a legal life insurance company. Those individuals paid annual membership dues and were entitled to all association privileges except voting and holding office. Honorary local association members generally consisted of individuals who had performed some distinguished public service. Those individuals did not pay annual membership dues and were entitled to all association privileges except voting and holding office. *472 Petitioner's bylaws provided that: Any Active or associate member in good standing in a member association may use the name or style "Member of The National Association of Life Underwriters," and may use any emblem, insignia, plate, sign, label, or phrase indicative of membership as may be approved by the Board of Trustees; provided, however, that this section shall not confer membership itself and all rights, powers, and duties thereof are exclusively reserved to member associations; and provided further, that neither the name of NALU nor any emblem, insignia, plate, sign, label or phrase indicative of membership shall be used in connection with any advertisement, policy form, business card, letterhead, application or other document associated with the business of insurance in such a manner as to infer or imply NALU approval or endorsement thereof. During the years at issue, petitioner had as members approximately 1,000 state and local associations, located in all 50 states and the District of Columbia. Approximately 127,000 individual life underwriters were local association members. Petitioner was governed by a National Council which met once a year at petitioner's annual *473 convention. The National Council had the power to elect petitioner's officers and trustees, to suggest and recommend policy for consideration by petitioner's Board of Trustees, to amend petitioner's bylaws, and to review and in some circumstances to overrule the Board of Trustees' actions taken since the last annual meeting. Petitioner's Board of Trustees governed petitioner between annual meetings. In general, the National Council consisted of two delegates, each having one vote, from each state and local association, with an additional 50 or 60 votes held by the trustees, past trustees, and past presidents. Local associations paid dues to petitioner in accordance with petitioner's bylaws. Petitioner's 1979 bylaws provided that: Each local association shall pay to NALU for each and every [local association] member, with the exception of honorary members, and disabled members as defined in Section 5 of this Article, the sum of Twenty-three Dollars ($ 23.00) per annum, [4] provided that One Dollar ($ 1.00) of the annual sum payable for each and every member shall be utilized either for the purposes of advertising the life insurance agent and the value of his services on a national *474 and international basis, or conducting research of a nature consistent with the objectives of NALU; and provided further, that the Board of Trustees shall be empowered to increase such dues by an additional Five Dollars ($ 5.00) to Twenty-eight Dollars ($ 28.00) per annum effective not earlier than the year beginning January 1, 1980. These dues shall become due each January 1, payable not later than March 1 thereafter, and shall be based upon the membership of the respective associations as shown in their annual reports to NALU on January 1, who remain such as of March 1. * * * State associations did not pay dues. Petitioner's bylaws provided that local association members would pay dues to their respective local associations in accordance with the local associations' bylaws. The NALU Model Local Association Bylaws provided that each local association member would pay, inter alia, the following amount: $    , plus required National Association *475 of Life Underwriters and State Association dues and fees, in the case of each Active and Associate member who has a residence or office located within the territorial limits of this Association. Each local association set its own dues, which averaged approximately $ 150 per year. Petitioner's Conferences
Petitioner had three conferences during the years at issue: (1) The General Agents and Managers Conference (GAMC); (2) the Association for Advanced Life Underwriting (AALU); and (3) the Women's Life Underwriters Conference (WLUC). Local association members were members of these conferences. GAMC addressed the needs of field management, general agents and managers. AALU ministered to the needs of persons who worked in very sophisticated markets, dealing primarily in pensions and employee benefits. WLUC was concerned with the particular needs of women who were making their way into the insurance marketplace. The conferences had some autonomy but the ultimate authority was in the NALU Board of Trustees. Life Association News
The deficiencies determined by respondent in this case relate primarily to petitioner's sale of advertising in its monthly magazine titled *476 Life Association News (LAN). LAN also included news items, articles, columns, and other editorial material. With respect to LAN, Article 20 of petitioner's bylaws provided: Section 4. The subscription price of the official publication of NALU for members shall be One Dollar ($ 1.00) per annum, due January 1st of each year; for non-members and honorary members, Three Dollars ($ 3.00) per annum; foreign members, Four Dollars ($ 4.00) per annum. Section 5. Each member association shall collect from each of its members the subscription price of the official publication as part of the regular membership dues. The official publication shall be mailed to each member of each association for the year or the months, respectively, covered by the dues based on his membership, and in case an association drops a member for the non-payment of the current year's dues it shall, unless report of such termination be received on or before March 1st, be charged at the aforesaid rate for all issues after the December issue that are mailed to said member before receiving report of termination. [5]
*477 Throughout LAN's history, every issue included a statement of publication and subscription information. At the beginning of the years at issue, the statement, in part, read as follows: Second class postage paid at Washington, D.C., and at additional mailing offices. Annual subscription rate for members of NALU is $ 1, which is included in the dues. Subscription for nonmembers is $ 3 per year; foreign, $ 4 per year. Single copies: Association members, 25 cents; others, 35 cents. Published monthly. Not available by subscription to persons eligible to join a local association. Beginning with the July 1982 issue, the $ 1 rate was increased to $ 1.50. Beginning with the March 1983 issue, the statement was changed to the following: LIFE ASSOCIATION NEWS (ISSN 0024-3078) is published monthly by the National Association of Life Underwriters. Second class postage paid at Washington, D.C., and at additional mailing offices. Annual subscription rate for members of NALU is $ 1.50, which is included in the dues. Subscription for nonmembers is $ 3 per year; foreign, $ 4 per year. Single copies: Association members, 25 cents; others, 35 cents. Not available by subscription to *478 persons eligible to join a local association. Nonmember LAN recipients, other than local association members, paid $ 3 ($ 4 for foreign subscribers) for LAN during the years at issue. All 127,000 local association members received LAN. In addition, a very small number of second subscriptions were sent to local association members for an additional $ 1. When petitioner received dues payments from the local associations, the funds were recorded on its working trial balances in three accounts: (1) NALU dues income; (2) public information income; and (3) LAN membership subscription income. [6] The LAN membership subscription account was distinguishable from another account used by petitioner, called "LAN nonmember subscriptions" on its working trial balances, which recorded the amounts received from LAN sales of $ 3 and $ 4 to nonmembers. Petitioner's working trial balances show LAN circulation income during the years at issue as follows: Account
Year
No. 201.01
No. 201.02
Ended
Membership Subscription
Nonmember Subscription
8/31/81
$ 202,583
$ 2,838
8/31/82
192,097
2,019
8/31/83
191,643
2,664
*479 On its returns for the years at issue, petitioner reported the following income and expenses associated with LAN: Gross
Direct
Advertising
Advertising
Circulation
Readership
Year
Income
Costs
Income
Costs
8/31/81
$ 2,063,790
$ 2,069,231
--   --   8/31/82
2,346,478
1,213,916
$ 194,116
$ 1,595,920
8/31/83
2,556,451
1,157,995
194,308
1,708,494
As a result, petitioner's fiscal 1981 return reported an advertising loss of $ 5,441 (gross advertising income less direct advertising costs). Petitioner's fiscal 1982 and 1983 returns both reported an advertising gain that was completely offset by excess readership costs (readership costs less circulation income). Petitioner filed at least one informal claim on audit requesting investment tax credits and reallocation of costs, and makes such claim here. Respondent's statutory notice allowed some of those investment tax credits and reallocation of costs, and disallowed others. Respondent determined that petitioner had the following income and expenses associated with LAN during the years at issue: Gross
Direct
Advertising
Advertising
Circulation
Readership
Year
Income
Costs
Income
Costs
8/31/81
$ 2,063,790
$ 1,692,944
$ 1,732,928
$ 1,459,891
8/31/82
2,346,478
1,676,465
1,394,278
1,367,012
8/31/83 [1]
2,556,451
1,690,237
1,532,852
1,455,565
*480 With respect to circulation income, respondent's notice states, inter alia, that: While you contend that the local [association] members are not members of NALU you did not use the LAN non member rate of $ 3 per year in reporting circulation income. As a result, respondent determined that the circulation income recorded by petitioner as LAN membership subscription income did not adequately reflect the income it received, and stated that the method respondent used to calculate petitioner's circulation income, shown in the table above, was to be found in section 1.512(a)-1(f)(4)(iii), Income Tax Regs.
Direct Advertising Costs and Readership Costs of LAN
In determining LAN expenses, respondent's notice stated, inter alia, that petitioner had not established that it was "entitled to allocate [to LAN] more than the historically used 27% of certain *481 NALU expenses", including: officer salaries, salaries & wages [LAN specifically identified salaries & wages are deducted separately], payroll taxes applicable to allocated salaries & wages, personal property taxes, depreciation [not including those assets specifically depreciated by LAN] pension expense, group insurance, employee benefits, temporary help, travel, postage general, telephone & telegraph, supplies & stationary [sic], rental equipment, deferred compensation, promotion, equipment maintenance, professional fees, building expenses in lieu of rent, committee expense, awards, repairs & maintenance, miscellaneous, dues & subscriptions, search committee and public information. Pension and group insurance expense specifically related to LAN employees is treated as a direct expense of LAN and is not considered in this allocation. As a result, respondent determined that 27 percent of the above expenses claimed on petitioner's returns and 27 percent of various expenses that petitioner had "historically" taken in the past but had not claimed on its returns were allocable to LAN. Respondent's notice also disallowed certain other NALU expenses entirely with *482 the following statement: You have not established why you should be allowed to allocate to LAN advertising and circulation expense a similar portion (see percentages noted above) of NALU convention expense, AALU, GAMC and WLUC conference expenses and NALU legislative expense including the Political Action Committee contribution NALU made in some of the years at issue. Historically these expense items were not allocated to LAN. Petitioner's fiscal year 1978 and 1979 returns had allocated 27 percent of various NALU expenses to LAN but had not allocated to LAN any portion of NALU convention expense, AALU, GAMC,and WLUC conference expenses, or NALU legislative expense. On its returns for the years at issue, petitioner allocated LAN expenses in the form of photographic supplies and artwork 100 percent to readership costs. Respondent's notice upheld this allocation. Petitioner's tax returns (Forms 990) and financial statements did not include the assets, liabilities, income, or expenses of the state and local associations. The state and local associations were not part of a group exemption for Federal income tax purposes and there was no group Form 990. Professional *483 Liability Program
Petitioner established a professional liability program (PLP) in 1964. PLP was designed to defend and protect an individual life underwriter against liability for errors and omissions arising out of his activities as an insurance agent or broker. Until 1980, the professional liability policy was provided by Fireman's Fund Insurance Co. (Fireman's Fund). In July 1980, petitioner, working through its committees, redesigned the plan and negotiated with other insurance carriers. Petitioner considered numerous proposals from different insurance companies and directed its insurance administrator, Marsh & McLennan, to carry on negotiations. American Home Assurance Co. (American Home) was chosen as alternate carrier by petitioner's board in October 1980. In January 1981, petitioner offered underwriters a new PLP underwritten by American Home. By June 1981, the program was approved by state authorities and was available in all states except New Jersey and Texas. Individual underwriters could choose to continue with Fireman's Fund or enroll in the new NALU-sponsored plan underwritten by American Home. The new plan was described and promoted in LAN, which touted *484 its advantages over the Fireman's Fund policy. State and local associations also participated in the promotion plan. Marsh & McLennan marketed the program by contacting state associations with a large number of insureds to discuss techniques to encourage further enrollment; by personally presenting the program to state and local associations; by mailing an announcement of the new plan, with a comparison to Fireman's Fund, to those presently enrolled in Fireman's Fund; by developing a slide program for presentation at state association sales congresses and conventions; by developing articles and advertisements for state and local association newsletters; by mailing promotional brochures with rates and applications to local association members; and by offering a toll-free number. During the years at issue, petitioner received reimbursement for expenses from the underwriter/administrator based on the number of policies sold or renewed up to a ceiling amount per policy (generally $ 5). Petitioner was reimbursed for items such as advertising and promoting the policies. Petitioner developed a form and guidelines for state associations to claim their share of "reimbursement for actual *485 expenses" in the promotion and administration of the program, "up to $ 4.00 per policy". Petitioner's state associations were encouraged to share these amounts with their respective locals, but only if the local associations produced vouchers for the amount they actually expended. Marsh & McLennan's checks to petitioner were described as "expense reimbursement". There are several memoranda in the record reflecting what Marsh & McLennan and petitioner believed could legally be paid as reimbursable expenses. Petitioner's returns for the years 1978 through 1983, at least, did not show petitioner's PLP activities as an unrelated business income item. By informal claim on audit, and before this Court, petitioner requested that its unrelated trade or business income for each of the years at issue be adjusted to reflect the following income and expenses from its PLP operations: Year
Income
Expenses
Net Losses
8/31/81
$ 64,852
$ 80,521
$ 15,669
8/31/82
7,223
84,410
77,187
8/31/83
41,273
87,634
46,361
Respondent disallowed in part petitioner's request. Respondent's notice states, inter alia: "You have failed to show that the PLP activity was engaged in for *486 a profit motive rather than just a cost reimbursement operation for the benefit of your members." Respondent determined that the unreported receipts attributable to the PLP program were gross income; expenses from each year were allowed to the extent of income earned for those years. As a result, petitioner's claimed net losses were disallowed. Personal Property
During the years at issue, petitioner had a Texas Instruments 990 Model 30 Computer System. The computer was used for several different purposes, the primary one being to store the names and addresses of all LAN recipients. At least 80 percent of computer use during the years at issue related directly to LAN. More than 80 percent of the computer's memory comprised LAN's mailing list. Petitioner did not claim any investment tax credits on its returns for the years at issue. Petitioner claimed on audit and now alleges that it should be considered to have acquired investment tax credit qualified property with the following bases: Year
Basis
8/31/78
$ 3,318.58
8/31/79
5,909.69
8/31/80
66,385.57
8/31/81
226,335.87
8/31/82
118,811.04
8/31/83
64,352.34
Respondent's notice disallowed the claim in part. *487 Respondent determined that petitioner had acquired assets which qualified for the credit with the following bases: Year
Basis
8/31/78
$ 2,020.00
8/31/79
2,842.00
8/31/80
6,585.00
8/31/81
5,665.50
8/31/82
98.00
8/31/83
9,488.04
OPINION Petitioner is exempt from Federal income tax, as a business league under section 501(c)(6), on its income which is related to its exempt purpose. Sec. 501(a). On the other hand, income from a trade or business which is not substantially related to an organization's exempt purpose is taxable as "unrelated business taxable income" (UBTI). Sec. 511(a)(1). The purpose of the tax on unrelated business income is to prevent unfair competition and to curb related abuses by otherwise nontaxable businesses with their taxable counterparts. United States v. American Bar Endowment, 477 U.S. 105 (1986); United States v. American College of Physicians, 475 U.S. 834 (1986). UBTI is generally defined as gross income from an unrelated trade or business less allowable deductions which are directly connected with the carrying on of such trade or business. Sec. 512(a)(1). A "trade or business" for these *488 purposes may include not only a complete business enterprise, but also any component activity of a business. Sec. 1.513-1(b), Income Tax Regs. As applicable to periodicals, the regulations "fragment" the "trade or business" of selling advertising space in the periodical from the "trade or business" of publishing the periodical. West Virginia State Medical Association v. Commissioner, 91 T.C. 651, 656 (1988), affd. 882 F.2d 123 (4th Cir. 1989). In the instant matter, petitioner published and distributed LAN, which contained editorial or readership material related to petitioner's exempt purpose, as well as paid advertising, which was not substantially related to petitioner's exempt purpose. Accordingly, the parties agree that income attributable to petitioner's enterprise of selling advertising is taxable pursuant to United States v. American College of Physicians, supra. The parties' dispute in this case involves the deductions and credits to which petitioner is entitled in determining UBTI. Most of the UBTI is attributable to the sale of LAN's advertising. With respect to the "fragmentation" approach to periodicals, *489 detailed regulations govern the allocation of revenues and expenses between an organization's tax exempt editorial activity and its taxable advertising activity. American Medical Association v. United States, 887 F.2d 760, 764 (7th Cir. 1989). Total income attributable to a periodical is divided into two categories: "gross advertising income" and "circulation income". Sec. 1.512(a)-1(f)(3)(i), Income Tax Regs. A periodical's total costs are also divided into two categories: "direct advertising costs" and "readership costs". Sec. 1.512(a)-1(f)(6)(i), Income Tax Regs. Direct advertising costs are fully deductible from gross advertising income, and any loss arising therefrom is allowable as a deduction in determining UBTI from any other unrelated trade or business carried on by the organization. Sec. 1.512(a)-1(f)(2)(i), Income Tax Regs. Additionally, the regulations permit readership costs incurred in the same taxable year to offset gross advertising income if, but only to the extent that, those costs exceed circulation income (excess readership costs). Sec. 1.512(a)-1(f)(2)(ii)(b), Income Tax Regs.[7] For purposes of this case, these rules can generally *490 be conceptualized by the following formula: Gross Advertising Income Less: Direct Advertising Costs Less: Excess Readership Costs (the amount by which readership costs exceed circulation income)
Net: UBTI from the sale of advertising For all 3 years at issue, the parties agree on petitioner's gross advertising income, but they disagree on the correct amounts of petitioner's direct advertising costs and readership costs. Their primary dispute, however, concerns the proper determination of petitioner's circulation income. Petitioner contends that its circulation income for all 3 years at issue was substantially less than what respondent determined, which, by itself, would result in more excess readership *491 costs being available to offset gross advertising income. Petitioner claims that a determination of the circulation income issue in its favor will completely dispose of this case since petitioner would then not have UBTI in any of the years at issue. [8] We therefore discuss circulation income before discussing direct advertising costs and readership costs. These are issues of first impression before this Court. Additionally, we discuss whether petitioner is entitled to additional deductions and investment tax credits in determining its UBTI in each of the years at issue. Issue 1: Circulation Income
The first issue for decision is whether respondent erred in determining that petitioner's circulation income, from allocable membership receipts, must be determined by applying the rule provided for in section *492 1.512(a)-1(f)(4)(iii), Income Tax Regs. Petitioner contends that its circulation income from allocable membership receipts must be determined by applying the rule provided for in section 1.512(a)-1(f)(4)(i), Income Tax Regs. The rule relied on by respondent and the rule relied on by petitioner will be referred to herein as rule (iii) and rule (i), respectively. Petitioner bears the burden of proving that respondent's determination was in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). The phrase "circulation income" means income attributable to the production, distribution, or circulation of a periodical (other than gross advertising income), including amounts realized from the sale or distribution of the readership content of a periodical. Sec. 1.512(a)-1(f)(3)(iii), Income Tax Regs. In addition, the regulation states that: Where the right to receive an exempt organization periodical is associated with membership or similar status in such organization for which dues, fees or other charges are received (hereinafter referred to as "membership receipts"), circulation income includes the portion of such membership receipts allocable to the periodical *493 (hereinafter referred to as "allocable membership receipts"). Allocable membership receipts is the amount which would have been charged and paid if -- (a) The periodical was that of a taxable organization, (b) The periodical was published for profit, and (c) The member was an unrelated party dealing with the taxable organization at arm's length. See subparagraph (4) of this paragraph for a discussion of the factors to be considered in determining allocable membership receipts of an exempt organization periodical under the standard described in the preceding sentence. [Id.] Both parties agree that the amounts petitioner received from the sale of LAN for $ 3 and $ 4 to nonmembers, recorded as LAN nonmember subscriptions in account 201.02, constituted circulation income. They also agree that a portion of petitioner's membership receipts must be allocated to circulation income, but they differ as to how that amount is calculated with their dispute centering on the status of the local association members and how much circulation income petitioner had as a result of the copies of LAN received by the local association members. Section 1.512(a)-1(f)(4), Income Tax Regs., *494 in part, provides: (4) Allocable membership receipts. The allocable membership receipts of an exempt organization periodical shall be determined in accordance with the following rules: (i) Subscription price charged to nonmembers. If 20 percent or more of the total circulation of a periodical consist of sales to nonmembers, the subscription price charged to such nonmembers shall determine the price of the periodical for purposes of allocating membership receipts to the periodical. (ii) [9] * * * (iii) Pro rata allocation of membership receipts. Since it may generally be assumed that membership receipts and gross advertising income are equally available for all the exempt activities (including the periodical) of the organization, the share of membership receipts allocated to the periodical, where paragraphs (f)(4)(i) and (ii) of this section do not apply, shall be an amount equal to the organization's membership receipts multiplied by a fraction the numerator of which is the total periodical costs and denominator of which is such costs plus the cost of other exempt activities of the organization. * * * *495 Petitioner contends that the receipt of LAN by the 127,000 local association members was the result of "sales to nonmembers" for $ 1 [10] per subscription, all of which is circulation income. In this respect, petitioner claims that the account its working trial balances called "LAN membership subscription", as well as its account called "LAN nonmember subscription", recorded circulation income from sales of LAN subscriptions to nonmembers. Petitioner then argues that rule (i) sets the price of LAN at $ 1 since approximately 97 percent (127,000/130,000) of LAN circulation was attributable to sales for $ 1 to nonmembers. As a result, petitioner alleges that its allocable membership receipts for each year at issue approximated $ 1,000, representing allocable membership receipts attributable to 1,000 "free" subscriptions it claims were received by the state and local associations. On the other hand, respondent contends under several theories that rule (iii) applies because less than 20 percent of LAN circulation consisted of "sales to nonmembers". Respondent also asserts that there is no evidence, other than self-serving testimony, that state and local associations had the right *496 to receive "free" LAN subscriptions. As her primary argument, respondent claims that the local association members had the right to receive LAN in association with their own "membership or similar status" in petitioner, as that phrase is used in section 1.512(a)-1(f)(3)(iii), Income Tax Regs., and that their subscriptions therefore cannot at the same time be considered "sales to nonmembers" under rule (i). In making this argument, respondent claims that the phrase "membership or similar status" in the regulation is a much broader category than "membership" and that legislative history and congressional intent must be consulted to determine its meaning. In contrast, petitioner cites American Medical Association v. United States, 887 F.2d 760 (7th Cir. 1989) for the proposition that *497 the specific rules in section 1.512(a)-1(f)(4), Income Tax Regs., override the general standards found in section 1.512(a)-1(f)(3)(iii), Income Tax Regs. According to petitioner, since rule (i) only uses the term "nonmembers" without any reference to "similar status", rule (i) applies because the local association members were not members of petitioner as defined by petitioner's bylaws. Alternatively, petitioner claims that the local association members did not have the status of members in petitioner. Neither the Code nor the regulations define the phrase "membership or similar status". In support of her contention that this phrase should be broadly construed, respondent relies entirely on the general proposition that Congress' intent was to prevent exempt organizations from engaging in unfair competition. Other cases have more than adequately discussed the intent of Congress in this area, e.g., United States v. American Bar Endowment, 477 U.S. 105 (1986); United States v. American College of Physicians, 475 U.S. 834 (1986); West Virginia State Medical Association v. Commissioner, 91 T.C. 651 (1988), affd. 882 F.2d 123 (4th Cir. 1989), *498 and we need not repeat the observations of those courts here. However, we have found no support for respondent's claim that the phrase should be interpreted more broadly than what it states. We believe "similar status" merely refers to a person, although not designated a member, which has the status of a member. Thus, we examine what constitutes the status of a member. In National Association of Postal Supervisors v. United States, 21 Cl. Ct. 310 (1990), affd. 944 F.2d 859 (Fed. Cir. 1991), the Claims Court considered whether the "dues" an exempt organization collected from "limited-benefit members" were actually unrelated business income from the sale of insurance. The Court found that the limited-benefit members were not really bona fide members of the organization because their membership had no meaning other than an opportunity to participate in a health plan. Id. at 320. Factors that the Court considered in making its determination included the perceptions of the organization's key officers as to the status of the limited-benefit members, the dearth of services actually received by the limited-benefit members, and *499 the organization's constitution, which provided that limited-benefit members could not vote, hold elected office, serve on committees, or offer technical advice. Id. at 320-321; see also American Postal Workers Union v. United States, 925 F.2d 480 (Fed. Cir. 1991)(" dues" from "associate members" were unrelated business income where associate members were entitled to insurance benefits but were not members in any other sense). Likewise, in two nontax cases, the Supreme Court has discussed the status of "members" of an organization. In Federal Election Commission v. National Right To Work Committee, 459 U.S. 197 (1982), the Court held that certain persons could not be considered "members" of an organization for purposes of a solicitation rule of the Federal Election Campaign Act, 2 U.S.C. sec. 441b(b)(4)(C). Factors that the Court considered in making its determination included the organization's charter and bylaws, which disclaimed the existence of members; the fact that the "members" played no part in the operation or administration of the organization, did not elect corporate officials, and did not assert any control *500 over the expenditure of their contribution; and the fact that there were no membership meetings. Federal Election Commission v. National Right To Work Committee, supra at 205. On the other hand, in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333 (1977), the Supreme Court held that a state promotional organization, which did not technically have members, did have standing to bring an action on behalf of the State's apple growers. In reaching that conclusion, the Court stated that although: the apple growers and dealers are not "members" of the Commission in the traditional trade association sense, they possess all the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them. * * * [Id. at 344-345.] None of the above cited cases purported to define the term "member". Nor do we. However, we do believe that those cases provide guidance on how the phrase "membership or similar status" should be interpreted in the *501 instant matter. First, a member has specified rights and obligations in relation to an organization, including the right to participate in the organization's direction and the obligation to help support the organization through regular financial contributions. Secondly, all the facts and circumstances, including the organization's charter and bylaws, may be consulted in determining what those rights and obligations are. Finally, labels are not determinative; a person's status will determine whether that person will be considered a member of an organization. Consequently, we reject petitioner's claim that a person can be a nonmember if he has the status of a member. Pursuant to petitioner's bylaws and throughout its history, only state and local associations could apply for membership in petitioner, were defined as members of petitioner, received a certificate of membership in petitioner, could vote in petitioner's elections (with limited exceptions), and could be expelled from petitioner. Only the local associations had the obligation to pay dues to petitioner. In form, then, only the local associations had both specified rights and obligations in relation to petitioner. On *502 the other hand, pursuant to the local associations' bylaws, local association members had essentially the same rights and obligations in the locals that the locals had in petitioner. Respondent recognizes that the local association members were not members of petitioner in the technical sense, but argues that they should be considered to have similar status because of the control petitioner asserted over the state and local associations. In this respect, respondent claims that the local associations should be viewed as subdivisions of petitioner. Respondent also asserts that being a "member of a member" is similar status to being a member because rights and obligations flowed to the local association members from petitioner's bylaws, including the right to receive LAN at a subsidized rate. Respondent's argument on this point is not persuasive. Initially, we believe the state and local associations controlled petitioner, not vice versa. Although petitioner had broad powers, it had only whatever powers the state and local associations chose to grant it through petitioner's bylaws. Additionally, the local association members did not possess the status of a member as defined in *503 petitioner's bylaws; the local association members did not have any direct rights or obligations in petitioner. Respondent's argument therefore in effect amounts to a claim that the status of the local association members was akin to a membership class that was not provided for in petitioner's bylaws. While this claim arguably has some merit regarding the right to participate in petitioner's direction, through representation, we do not believe it applies to an obligation to pay dues to petitioner. Respondent argues that we should determine that the local association members' dues, in part, flowed through the local associations, so that it was actually the local association members that paid dues to petitioner. [11] Indeed, this flowthrough of dues argument is crucial to respondent's argument on this point because it is part of these "members'" dues that respondent argues should be allocated to petitioner's circulation income. The problem with respondent's analysis, however, is that it would require a finding that the local associations themselves did not pay dues to petitioner. *504 We do not believe that the evidence in this case supports disregarding the local associations' obligation to pay dues, or to "sham" the local associations and treat them as if they were actually petitioner. Expert evidence was received that one of the primary purposes of a federated association was to concentrate power in the association and to preclude local association members from acquiring membership status. Thus, as far as petitioner was concerned, the local association from Lodgepole, Nebraska, with 17 members, had as much power as the local association from New York, New York, with 3,000 members. We believe that there were valid reasons for having a federated association which the evidence in this case does not support disregarding. Cf. Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). We hold that the local association members did not pay dues to petitioner. Rather, they paid dues to their respective local associations. In turn, the local associations had the obligation and paid dues to petitioner. Accordingly, we reject respondent's primary contention that the local association members received LAN as a result of their own membership *505 or similar status in petitioner. Alternatively respondent argues that the local association members received LAN in association with the local associations' membership or similar status in petitioner. Petitioner claims there is "not one shred of evidence to support that theory". We disagree. Indeed, we reject outright petitioner's claim that it sold any LAN subscriptions to nonmembers for $ 1. In this respect, even if we were to accept petitioner's claim that it sold LAN subscriptions to the local association members, it is uncontroverted that petitioner charged more than $ 1 per subscription; petitioner also required that the person be a member of one of its dues-paying local associations. However, we are convinced that petitioner "sold" those subscriptions to the local associations rather than to the local association members. As noted above, we rejected respondent's argument that the dues of the local association members flowed through to petitioner. However, petitioner wants to have it both ways by claiming that the $ 23 per local association member payments made by the local associations should be considered in part the local associations' dues, and in part the flowthrough *506 from the local association members to petitioner of the $ 1 sales price for the magazine. Petitioner presented the testimony of Mr. Jack Bobo (Bobo), its executive vice president and chief executive officer, in support of this contention. For several reasons, we find petitioner's argument on this point unpersuasive. Initially, Bobo testified that the total payment to petitioner from the local associations was $ 23 per year for each of their members, of which $ 1 was for public information, $ 1 was for LAN, and $ 21 was for the local associations' dues. That may have been how petitioner treated the payments, but we believe the bylaws defined them differently. The bylaws provided that the local associations should pay $ 23 per year provided that $ 1 shall be utilized for public information, and that these "dues" shall become due each January 1. In essence, petitioner claims that the local associations paid less in dues than what was called for in its bylaws. Secondly, petitioner's bylaws unambiguously provided that its members consisted of state and local associations. The limited exception to this was that local association members could refer to themselves as members of *507 NALU for some purposes but that this "shall not confer membership upon individuals in any way, as membership itself and all rights, powers, and duties thereof are exclusively reserved to membership associations". Petitioner's 1979 bylaws then provided that the LAN subscription price was $ 1 for members and $ 3 for domestic nonmembers. Looking solely to the 1979 bylaws, therefore, it would appear that sales for $ 1 could be made only to the state and local associations. Petitioner now claims, however, that it could call the members of the local associations members of itself and grant them the right to purchase LAN at the members' price. Again, we believe in substance petitioner is asking us to find that it could, and did, grant a membership right to a nonmember that apparently violated its bylaws. Thirdly, as we have found, LAN itself contained a provision, similar to that found in petitioner's bylaws, stating that a subscription was $ 1 for members and $ 3 for domestic nonmembers. "Bobo testified that the term member" in this provision referred to local association members. That same provision in LAN, however, also provided that LAN was not available to persons eligible to *508 join a local. Consequently, we question who was being referred to as nonmembers in this provision when a very large portion of the nonmember population who might be interested in LAN either could not purchase it or allegedly purchased it for $ 1. On this same point, while Bobo testified that it was only for a "very, very brief period" of time that persons eligible to join a local could not purchase LAN, the parties' stipulations of fact in this case show that a provision to that effect appears to have been in LAN for at least 30 of the 36 months before us. Fourthly, petitioner's trial balance sheets called the amounts "membership subscriptions", not "nonmembership subscriptions". Fifthly, we believe that petitioner's bylaws themselves provided that LAN subscriptions did not flowthrough from the individual nonmembers to petitioner. In this regard, the bylaws stated that a local association had to pay annual dues and magazine subscriptions in order to obtain a certificate of election in petitioner, and also stated: in case an association drops a member for the non-payment of the current year's dues it shall, unless report of such termination be received on or before March *509 1st, be charged at the aforesaid rate for all issues after the December issue that are mailed to said member before receiving report of termination. Indeed, in this latter situation it is clear that no amounts flowed through. We find that the local association members received their copies of LAN as a result of petitioner receiving $ 23 per local association member in "dues, fees, or other charges" from the local associations. [12] See sec. 1.512(a)-1(f)(3)(iii), Income Tax Regs. It makes no difference that nonmembers actually received the periodical that members "purchased" with their dues. See North Carolina Citizens for Business & Industry v. United States, 18 Cl. Ct. 106 (1989). *510 Petitioner next argues that if there were no sales to the local association members, then the "free" subscriptions those individuals received should not be included in LAN circulation, citing American Hospital Association v. United States, 654 F. Supp. 1152 (N.D. Ill. 1987). In that case, in 1973, an exempt organization's periodical was sent free of charge to all 27,000 of its members, was sold to 9,200 nonmembers, and, in order to increase the periodical's attractiveness to advertisers, was sent free of charge to a controlled circulation group consisting of 35,800 nonmembers. The issue in that case was whether 20 percent or more of the total circulation of the periodical consisted of sales to nonmembers so that rule (i) applied. Based on the facts in that case, the District Court excluded from "circulation" the free distributions sent to nonmembers, and considered only "paid" circulation in its holding that more than 20 percent of total circulation of the periodical consisted of sales to nonmembers (9,200/(9,200 + 27,000)). Petitioner argues that since we decided that it did not sell LAN to local association members, the 127,000 local association member subscriptions *511 must be considered free subscriptions that get excluded from LAN circulation for purposes of rule (i). Accordingly, petitioner asserts that total circulation of LAN consisted of 1,000 subscriptions allegedly received free of charge by the state and local associations plus 2,838 [13] subscriptions sold for $ 3 and $ 4 to nonmembers. Petitioner argues that rule (i) therefore still applies since approximately 74 percent (2,838/(1,000 + 2,838)) of LAN circulation consisted of sales to nonmembers. *512 Respondent, on the other hand, argues that this case is analogous to North Carolina Citizens for Business & Industry v. United States, supra.In that case, an association's annual membership dues ranged from $ 50 to $ 4,000. For every $ 50 in dues paid, a member was entitled to receive one subscription to the organization's magazine. The member could then designate a nonmember to receive, without further charge, the copy of the subscription purchased by the dues. In holding that total circulation included the subscriptions received free of charge by the nonmembers, the court distinguished American Hospital Association v. United States, supra, on the basis that members' dues were being used to "purchase" the magazine. Consequently, the court determined that the "free" subscriptions were actually part of "paid" circulation. We agree with respondent. We need not address whether the term "circulation" as used in rule (i) means the total distribution of a periodical, or only paid circulation of a periodical, since it is clear in this case that the local association members' copies of LAN were "paid" for through the local associations' *513 "dues, fees, or other charges" paid to petitioner. Consequently, the 127,000 local association member copies must be considered part of LAN's circulation in determining whether 20 percent or more of total circulation consisted of sales to nonmembers. North Carolina Citizens for Business & Industry v. United States, supra; American Hospital Association v. United States, supra.
Finally, we also reject petitioner's claim that we should not apply rule (iii) because it results in allocable membership receipts per subscription ranging from approximately $ 6 to $ 14 throughout the years at issue. Petitioner does not question the validity of the regulation, only its alleged unreal and unfair application. The rules found in section 1.512(a)-1(f)(4), Income Tax Regs., however, override the general facts and circumstances standard found in section 1.512(a)-1(f)(3)(iii), Income Tax Regs.
American Medical Association v. United States, supra.
Petitioner has failed to persuade us that at least 20 percent of LAN circulation was attributable to sales to nonmembers. Thus, petitioner may not determine membership receipts *514 allocable to LAN under rule (i). Accordingly, respondent's determination that circulation income from allocable membership receipts must be determined under rule (iii) is sustained. Issue 2: Direct Advertising Costs and Readership Costs
The second issue that we must decide is whether respondent erred in determining petitioner's direct advertising costs and readership costs associated with LAN. As previously noted, UBTI is determined by reducing gross income from an unrelated trade or business by allowable deductions which are directly connected with the carrying on of the trade or business. Sec. 512(a)(1). To be "directly connected with" the conduct of unrelated business, an item of deduction must have proximate and primary relationship to the carrying on of that business. Sec. 1.512(a)-1(a), Income Tax Regs.
Items of deduction attributable solely to unrelated business activities are deductible to the extent that they satisfy other relevant provisions of the Code. Sec. 1.512(a)-1(b), Income Tax Regs. Where facilities or personnel are used both to carry on exempt activities and conduct unrelated business activities, items of deduction must be allocated between the two *515 uses on a reasonable basis (dual-use expenses). Sec. 1.512(a)-1(c), Income Tax Regs. Items of deduction solely attributable to, or reasonably allocated to, unrelated business activities are by definition directly connected. Rensselaer Polytechnic Institute v. Commissioner, 732 F.2d 1058, 1061 (2d Cir. 1984), affg. 79 T.C. 967 (1982); sec. 1.512(a)-1(b), (c), Income Tax Regs.
In those cases where gross income is derived from an unrelated trade or business activity which exploits an exempt activity, however, items of expense attributable to the exempt activity are not proximately and primarily related to the unrelated trade or business activity and are not deductible in computing UBTI, except to the extent provided for in the regulations. Sec. 1.512(a)-1(d), Income Tax Regs. The sale of advertising in a periodical of an exempt organization which contains editorial material related to accomplishment of the organization's exempt purpose is an example of an unrelated trade or business activity which exploits an exempt activity. Id.
With respect to an exempt organization's periodical, the regulations can be viewed as in effect requiring two *516 allocations of expenses: (1) Between the periodical and the other activities of the exempt organization; and (2) between the exempt and the nonexempt activities within the periodical itself. See sec. 1.512(a)-1(f)(6), Income Tax Regs.
As noted above, total expenses attributable to a periodical are termed "total periodical costs" and consist of the sum of direct advertising costs and readership costs. Sec. 1.512(a)-1(f)(6)(i), Income Tax Regs. In the instant matter, the parties disagree both as to what constitutes total periodical costs, as well as how those costs are to be allocated between direct advertising costs and readership costs. For ease of analysis, we discuss these under separate headings. a. Total Periodical Costs
Total periodical costs do not include items of deduction properly attributable to exempt organization activities other than the publication of an exempt organization periodical. Sec. 1.512(a)-1(f)(6)(i), Income Tax Regs. The regulation also provides that: Where items are attributable both to an exempt organization periodical and to other activities of an exempt organization, the allocation of such items must be made on a reasonable basis which *517 fairly reflects the portion of such item properly attributable to each such activity. The method of allocation will vary with the nature of the item, but once adopted, a reasonable method of allocation with respect to an item must be used consistently. * * * [Id.] In her statutory notice, respondent allowed all of the total periodical costs that petitioner had claimed that were incurred solely within the LAN department. With respect to expenses not incurred solely within the LAN department, however, respondent determined that petitioner had not established that it was entitled to allocate to total periodical costs more than the "historically" used 27 percent of certain dual-use NALU expenses. Additionally, respondent allowed no allocation to LAN of convention expenses, conference expenses (AALU, GAMC, and WLUC), and legislative expenses on the basis that no portion of these expenses was "historically" allocated to LAN, and petitioner had not shown that any part of those expenses should be allocated to LAN. [14] As previously noted, petitioner bears the burden of proving that respondents' determination was in error. *518 Petitioner does not assert that the allocations of the various expenses it claimed on its returns were correct. Rather, petitioner argues that it should be able to allocate dual-use NALU expenses to total periodical costs, and also within LAN, via an eight-step "Cost Identification and Allocation Method". [15] In support, petitioner asserts that: The law is clear that Petitioner need not show that its allocation methods were the most reasonable, or even more reasonable than an IRS -- preferred method, but solely that they were reasonable. Even if Respondent's calculations were reasonable, Petitioner's procedures may not be rejected if they were also reasonable. Peninsula Steel Products v. Commissioner, 78 T.C. 1029, * * * [1058] (1982) (citing cases).
*519 We believe that petitioner has erroneously attempted to shift the burden of proof on this issue. In Peninsula Steel Products & Equipment Co. v. Commissioner, 78 T.C. 1029 (1982), we held that respondent could not compel a taxpayer to change from one permissible method of accounting (LIFO) to another permissible method preferred by respondent (FIFO). In contrast, the instant matter involves respondent's determination that petitioner could not change its method of allocation from the method of allocation it had consistently used in the past and which respondent had determined was reasonable. The regulation clearly states that "once adopted, a reasonable method of allocation with respect to an item must be used consistently." Sec. 1.512(a)-1(f)(6)(i), Income Tax Regs. If petitioner cannot show that respondent erred in her determination, based upon petitioner's established practice, a determination as to the reasonableness of petitioner's eight-step method is largely irrelevant since, as both parties apparently recognize, more than one reasonable method of allocating expenses may exist. Initially, we reject petitioner's repeated claim that petitioner has consistently *520 used its eight-step allocation method and merely wants to amend all its previous returns; [16] petitioner's argument is disingenuous and in substance amounts to a claim that even though it may adopt an allocation method it need not use it consistently. The regulation expressly provides otherwise. Sec. 1.512(a)-1(f)(6)(i), Income Tax Regs. Additionally, petitioner's repeated reference to the fact that its "original" (first ever) UBTI return is not in the record merely stresses the fact that petitioner did not place the return in evidence. Rule 142(a). Respondent does not have the burden of proving that petitioner allocated 27 percent of dual-use NALU expenses to total periodical costs throughout petitioner's history, and the failure of respondent's agent, who used the 27-percent amount in the statutory notice, to testify does not weight against respondent on this point. Petitioner's own comptroller testified that 27 percent of those NALU expenses were allocated to total periodical costs in 1978 and 1979. Respondent determined that this was petitioner's "historical" method. Petitioner has not persuaded us that respondent erred on this point. Thus, we examine whether that method *521 reasonably allocated expenses. See sec. 1.512(a)-1(f)(6)(i), Income Tax Regs.
Petitioner first argues that in allocating 27 percent of certain dual-use expenses to LAN, respondent permitted only "indirect expenses" to be allocated and unreasonably denied an allocation for the "direct expenses" of some of those dual-use items. For example, petitioner interviewed all of its employees to determine how much time they spent on LAN. Petitioner claims that it should be allowed to deduct the proportion of the salaries that it can specifically identify as allocable to LAN as "direct expenses". Petitioner argues that it should then be entitled to deduct as "indirect expenses" a proportion of the salaries that it cannot specifically identify as being allocable to either LAN or NALU itself. This and other courts have used the terms "direct and indirect expenses" in various cases involving *522 the determination of UBTI. Disabled American Veterans v. United States, 704 F.2d 1570, 1572 n.12 (Fed. Cir. 1983) (direct expenses include costs of premiums and mailing costs; indirect expenses include general overhead and administrative salaries); North Ridge Country Club v. Commissioner, 89 T.C. 563, 565 (1987), revd. on other grounds 877 F.2d 750 (9th Cir. 1989) (direct expenses are directly traceable and would not have been incurred but for the unrelated activity; indirect expenses are incurred whether or not there is unrelated activity); Rensselaer Polytechnic Institute v. Commissioner, 79 T.C. at 968-969 (direct expenses include costs which have been specifically identified; indirect expenses include expenses which cannot be shown to be attributable solely to a particular related or unrelated use as well as expenses that would have been incurred whether or not there is unrelated activity). Petitioner claims that it is clear from these cases that both "direct" and "indirect" expenses are deductible, and respondent erred in disallowing a deduction for "direct expenses". We disagree. The critical question *523 in each of the above cases was whether there had been a reasonable allocation of expenses to an unrelated activity. In the instant matter, respondent allocated 27 percent of certain NALU dual-use expenses to LAN. There is no evidence that the amounts allocated as dual-use expenses were not reasonable. Rather, petitioner apparently claims that the method was unreasonable because the expenses were not termed "direct expenses" and "indirect expenses". We believe petitioner is merely engaging in semantics. Petitioner has failed to persuade us that respondent erred by allocating 27 percent of certain dual-use expenses to LAN. Petitioner next claims that respondent erred in not allowing any allocation to LAN for convention expense, conference expenses (AALU, GAMC, and WLUC), and NALU legislative expense because the law is clear that "indirect expenses" are deductible. In this regard, petitioner claims that an allocation must be made for all these expenses because they are part of NALU's overhead. Respondent argues that the expenses were not directly connected to LAN, and further argues that the income from the conferences exceeded the expenses of the conferences. Petitioner's claim *524 that all indirect costs of an exempt organization are deductible is not supported by the cases it cites as authority for its position. In Rensselaer Polytechnic Institute v. Commissioner, 79 T.C. at 973, the taxpayer did not seek, and was not permitted to deduct against its business income expenses other than a portion of the expenses of operating the unrelated business. Likewise, in North Ridge Country Club v. Commissioner, 89 T.C. at 566 n.6, the parties stipulated that the expenses they were calling "indirect expenses" were directly connected with the unrelated business activity. We believe that before an expense may be allocated to total periodical costs, there must be some showing that the expense is connected to total periodical costs. In other words, the expense must be a dual-use expense within the exempt organization itself. In the instant matter, the expenses associated with petitioner's convention, conferences, and legislative lobbying activities were direct expenses of those activities. The regulation provides that no items of deduction properly attributable to exempt organization activities other than the publication of *525 an exempt organization periodical may be allocated to total periodical costs. Sec. 1.512(a)-1(f)(6)(i), Income Tax Regs. Merely because LAN provided magazine coverage for some of the events does not make the expenses dual use. Petitioner has failed to persuade us that it is entitled to allocate convention, conferences, and legislative expenses to LAN. Respondent determined that petitioner was limited to allocating 27 percent of certain dual-use expenses to total periodical costs. Respondent also determined that petitioner was not entitled to allocate any part of certain other deductions to total periodical costs because petitioner had not historically allocated any portion of those items and had not substantiated that they were directly connected with LAN. Petitioner has not persuaded us that respondent erred in her determination. Accordingly, respondent's determination on this point is sustained. b. Allocation of Expenses Within LAN
Direct advertising costs include items of deduction which are directly connected with the sale and publication of advertising. Sec. 1.512(a)-1(f)(6)(ii), Income Tax Regs. Readership costs include items of deduction which are directly connected *526 with the production and distribution of the readership content of the periodical. Sec. 1.512(a)-1(f)(6)(iii), Income Tax Regs.
The parties agree that the expenses incurred solely within the editorial activity or solely within the advertising activity should be allocated to the activity in which those expenses were incurred. They also agree as to the allocation of most dual-use expenses. Their disagreement concerns the allocation of: (1) Postage-mailing expense; (2) paper and printing expense; and (3) photographic supplies and artwork expenses. On its returns, petitioner allocated postage-mailing expenses approximately 58 percent to advertising cost and 42 percent to readership cost. Petitioner here argues that 73 percent of postage expenses should be allocated to advertising cost and 27 percent should be allocated to readership cost. Respondent determined that 27 percent of U.S. Postal Service poundage charge was allocable to readership cost and the balance was allocable to advertising cost as proposed by petitioner. Respondent disallowed the balance of petitioner's claim on audit concerning the allocation of postage-mailing expense. Respondent's notice, inter alia, states: *527 (2) You ignored the additional per piece charge in your calculation. That is, you allocated the total postal cost based on the poundage charge. The per piece charge is not an allocable expense but one directly related to editorial copy. It would apply whether or not there was advertising copy in issue. No allocation is allowed for the per piece charge. As a result, respondent determined that petitioner must allocate 100 percent of the per piece mailing expense to readership cost. At trial, petitioner presented evidence of the charge the U.S. Postal Service imposed for poundage, and argues that allocating all postage-mailing expense 73 percent to advertising cost and 27 percent to readership cost was reasonable in the manner it suggests because all it had to do was read the top portion of the postal service's bills. Petitioner claims it is unreasonable not to allow any expenses associated with mailing each copy of LAN to be allocated to advertising cost. Section 1.512(a)-1(f)(6)(ii)(a), Income Tax Regs., does not provide for items of deduction associated with the distribution of advertising. Rather, section 1.512(a)-1(f)(6)(ii)(c), Income Tax Regs., states that *528 "In addition to the items of deduction normally included in standard account classification relating to advertising costs, it is also necessary to ascertain the portion of mechanical and distribution costs attributable to advertising lineage." No evidence was received by the Court regarding what constitutes standard account classification relating to advertising costs. It appears that distribution costs are not normally considered advertising costs. Respondent permitted 73 percent of the poundage charge as an allocation to advertising cost. There is no evidence other than petitioner's argument that this was an unreasonable allocation of postage-mailing expenses. On its returns for the years at issue, petitioner allocated paper and printing expenses 57 percent to advertising cost and 43 percent to readership cost. Petitioner here requests that these costs be allocated 73 percent to advertising cost and 27 percent to readership cost, generally on the basis that advertisers required a much higher quality of paper and printing than petitioner would normally use. Respondent limited petitioner's allocation of these expenses to 57 percent advertising and 43 percent readership, as *529 petitioner had originally done, on the basis of lack of substantiation. Petitioner's returns and respondent's notice allocated paper and printing expenses between readership and advertising based on the advertising/editorial lineage split. We are not persuaded that respondent erred in her determination. This is a reasonable method of allocating those expenses, sec. 1.512(a)-1(f)(6)(ii)(c), Income Tax Regs., and petitioner has not substantiated that it should be disregarded. Petitioner's returns, as well as respondent's notice, allocated photographic supplies and artwork expenses 100 percent to readership costs. Petitioner has persuaded us that these are expenses that should be allocated 57 percent to advertising cost and 43 percent to readership cost. Accordingly, we hold that petitioner may allocate paper and printing expense, photographic supplies, and artwork expenses 57 percent to advertising costs and 43 percent to readership costs. We also hold that 100 percent of per piece mailing expense must be allocated to readership cost, while poundage expense may be allocated 73 percent to advertising cost and 27 percent to readership cost. Issue 3: Loses From PLP Program
*530 The next issue that we must decide is whether, in determining UBTI, petitioner may deduct losses it allegedly incurred in connection with its PLP program. When an organization derives gross income from the regular conduct of two or more unrelated business activities, UBTI is the gross income from all such unrelated business activities less the aggregate of the deductions allowed with respect to all such unrelated business activities. Sec. 1.512(a)-1(a), Income Tax Regs.
Respondent's notice determined that petitioner was not entitled to deduct PLP expenses in excess of PLP income because petitioner lacked a profit motive with respect to its PLP program. Petitioner claims that its PLP program was clearly run as a business and the fact that there were no profits during the years at issue is not determinative. Additionally, petitioner claims that respondent and the courts have consistently taken the position that activities such as petitioner's PLP program constitute an unrelated trade or business. See, e.g., National Water Well Association, Inc. v. Commissioner, 92 T.C. 75 (1989). Even though a section 501(c)(6) exempt organization may continuously and regularly *531 engage in an unrelated activity, losses from the activity may not be used to offset UBTI if the unrelated activity was not entered into primarily for profit. West Virginia State Medical Association v. Commissioner, 91 T.C. 651 (1988), affd. 882 F.2d 123 (4th Cir. 1989). We do not believe that petitioner's PLP program was an activity entered into primarily for profit. Indeed, it appears that both Marsh & McLennan and petitioner expressly limited the payments made to petitioner, and to the associations, to reimbursable expenses because of a belief that any other type of payment would violate various state insurance laws "involving unlawful rebates or paying of commissions to unauthorized persons, as well as other considerations". Rather than having a profit motive, we believe petitioner had the primary objective of recovering no more than the costs it incurred in relation to the PLP program. We find that petitioner's PLP program was not an unrelated trade or business. West Virginia State Medical Association v. Commissioner, supra.Accordingly, we hold for respondent on this issue; any net losses from the PLP operation *532 are not deductible in determining petitioner's UBTI. Issue 4: Investment Tax Credits
The next issue that we must decide is whether petitioner is entitled to investment tax credits in excess of those allowed in respondent's statutory notice. Petitioner did not claim investment tax credits on its returns for the years at issue or in any of the NOL years. Respondent allowed petitioner investment tax credits for some specific equipment used in connection with LAN in tax years 1978 through 1983. Petitioner now contends that it is entitled to further investment tax credits for a computer and various other equipment. Section 38 allows an investment tax credit for certain section 38 depreciable property. Section 48(a)(4), in part, provides: Property used by an organization (other than a cooperative described in section 521) which is exempt from the tax imposed by this chapter shall be treated as section 38 property only if such property is used predominantly in an unrelated trade or business the income of which is subject to tax under section 511. * * * We initially address petitioner's claim that it is entitled to an investment tax credit for the computer. At least 80 *533 percent of the computer's use during the years at issue was directly related to LAN. The primary use of the computer was to keep the list of the names and addresses of the persons to which LAN would be mailed. Indeed, more than 80 percent of the computer's memory was taken up by LAN's mailing list. Petitioner claims that it obtained the computer in order to satisfy advertisers' requirements for timely distribution of the magazine. Petitioner claims that the "computer had to be powerful, and the printers had to be fast, to print the mailing labels and produce the magazine in a timely fashion." In claiming that it is entitled to an investment tax credit for the computer, petitioner asserts that it should be able to allocate the use of the computer 75 percent to advertising and 25 percent to editorial. Petitioner claims it should be entitled to this allocation since 75 percent of LAN employee salaries are allocable to advertising. Thus, petitioner asserts, 75 percent of the computer's use must be allocable to advertising. We disagree. We believe the editorial use of the computer was predominant. Petitioner's unrelated trade or business in this case was selling advertising, not *534 publishing or distributing the magazine. See West Virginia State Medical Association v. Commissioner, supra.Further, we believe it makes no difference that the majority of persons to whom LAN was mailed were not members of petitioner. Cf. sec. 1.512(a)-1(e), Income Tax Regs. (property used to maintain membership lists is not depreciable). Just as the amounts petitioner received for the magazine were not taxable because they constituted nontaxable circulation income attributable to the editorial content of the magazine, the use of the computer to distribute the periodical to those persons was predominantly an editorial use. Petitioner has failed to persuade us that the computer was used primarily to satisfy LAN's advertisers. We hold that petitioner is not entitled to an investment tax credit with respect to the computer. Petitioner also claims that it is entitled to investment tax credits for various other equipment. Petitioner asserts that equipment physically located within the LAN department was 100 percent allocable to LAN, while the equipment located outside the LAN department was allocated to LAN on the basis of the salary ratio, referred to *535 above. Other than testimony that various equipment was used for advertising, there is nothing in the record that supports petitioner's claim that the equipment was predominantly used for advertising. Further, the record does not reveal what comprised the equipment for which the tax credits are claimed. Respondent determined that petitioner was entitled to certain investment tax credits. Petitioner has not persuaded us that it was entitled to investment tax credits in excess of those determined by respondent. Accordingly, respondent's determination as to petitioner's entitlement to investment tax credits is sustained. Issue 5: Deductions for District of Columbia Unrelated Business Income Tax
The next issue that we must decide is whether petitioner may deduct District of Columbia unrelated business income taxes during any of the years at issue. As an accrual method taxpayer, petitioner is generally entitled to deduct expenses in the taxable year in which all events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. Sec. 461(a); United States v. Anderson, 269 U.S. 422 (1926). Petitioner *536 contends that if we determine that it owes unrelated business income tax for the years at issue, then petitioner is entitled to deductions for accrued District of Columbia taxes that it owes for those same years. Respondent, on the other hand, argues that petitioner in effect has contested its District of Columbia taxes during the years at issue and that its accruals of the deductions must be deferred until either the dispute is resolved or the liability is paid, citing Dixie Pine Products Co. v. Commissioner, 320 U.S. 516 (1944). District of Columbia law, in part, provides: (1) If the amount of taxable income for any taxable year or part thereof of any taxpayer as declared by such taxpayer or his duly authorized agent to the United States Treasury Department for federal income tax purposes is changed or corrected by the Commissioner of Internal Revenue, or by any court of the United States, or by any court of the District of Columbia * * * such taxpayer or his duly authorized agent shall, within 90 days after such change or correction is finally determined, report in writing such changed or corrected taxable income to the District of Columbia. The Mayor *537 or his duly authorized representative may within 180 days from the date of the receipt of written notice from the taxpayer * * * assess or reassess the amount of any tax imposed by this chapter: Provided, however, that, in the event the date of receipt by the District of Columbia of a notice from the taxpayer or his duly authorized agent is more than 180 days prior to the expiration of the applicable period of limitations provided for in subsection (a) of this section, the Mayor or his duly authorized representative shall have until the expiration of such applicable period to assess or reassess the amount of any tax imposed by this chapter. Failure to report such changed or corrected taxable income as finally determined within the time stated herein shall suspend the running of the period of limitation for a period of 180 days after the date such report from the taxpayer * * * is received by the District of Columbia. (2) For the purposes of this subsection, the words "finally determined" mean any irrevocable determination or adjustment of the taxpayer's liability for tax, from which there exists no further right of appeal or review, either administrative or judicial. This subsection *538 shall apply with respect to taxable years beginning on or after January 1, 1975. * * * [D.C. Code Ann. sec. 47-1812.10(e) (Michie 1981).] With respect to its District of Columbia taxes, petitioner "acknowledges such liability will arise if the federal UBIT liability exists". Petitioner claims, however, that it has never contested its District of Columbia unrelated business income taxes to the District of Columbia authorities. Rather, petitioner claims its contest is with respondent. The record herein does not disclose whether petitioner ever filed any income tax returns with the District of Columbia, nor, if it did, whether any liability for District of Columbia unrelated business income tax was disclosed. In Consolidated Industries, Inc. v. Commissioner, 82 T.C. 477 (1984), affd. 767 F.2d 41 (2d Cir. 1985), this Court addressed the issue whether the contest of a Federal tax liability was tantamount to a contest of a State of Connecticut tax liability. We stated that: If the Connecticut tax liability is inextricably related to, and dependent upon, the Federal determination of the compensation issue, it may be that a protest of the Federal *539 liability is a protest of the State liability. [Id. at 481; citations omitted.] In that case, we held that there was a contest of the State tax liability because Federal tax liability and Connecticut tax liability inevitably moved in tandem. Id. at 482. Petitioner claims that Consolidated Industries, Inc. v. Commissioner, supra, is distinguishable from the instant matter because the State of Connecticut "required the taxpayer to self-assess adjustments by an 'automatic' amended State tax return. In contrast, the District of Columbia merely requires notice of federal changes". We do not believe this distinction is significant. Organizations which would otherwise be exempt from taxation under District of Columbia law are taxable to the extent that they have unrelated business income subject to tax under section 511. D.C. Code Ann. sec. 47-1802.1 (Michie 1981). The District of Columbia defines both gross income and deductions by references to the Internal Revenue Code. D.C. Code Ann. secs. 47-1803.2 and 47-1803.3. As noted above, petitioner itself recognizes that a District of Columbia tax liability will exist *540 if a Federal tax liability exists. We hold that the contest of petitioner's Federal tax liability is effectively a contest of any corresponding District of Columbia liability, where petitioner attempts to make no other distinction between the two. Consolidated Industries, Inc. v. Commissioner, supra.We accordingly hold for respondent on this issue. Based on the foregoing, Decision will be entered under Rule 155. Footnotes
1. Petitioner also claims that it is entitled to deduct net operating loss (NOL) carryovers from various years not at issue. Petitioner's entitlement to these NOL carryovers depends solely on how we decide the other issues in this case. Consequently, we do not discuss the NOL carryovers separately in this Opinion.↩
2. All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
3. Throughout the remainder of this Opinion, the phrase "local association member" shall refer to an individual who was a member of a local association. The phrase "local association" shall refer to a local association which was a member of petitioner.↩
4. The 1983 bylaws provided that the sum was $ 28 per annum.↩
5. Sec. 4 was deleted in the 1983 version of petitioner's bylaws. The quoted Sec. 5 became Sec. 4 in the 1983 bylaws.↩
6. Subsequent to the years at issue, petitioner changed the name of its LAN membership subscription account on at least one copy of its working trial balances to "LAN subscriptions".↩
1. Respondent now concedes that fiscal year 1983 direct advertising costs and readership costs should be increased to $ 1,710,181 and $ 1,470,370, respectively.↩
7. Excess readership costs may offset gross advertising income only to the extent that a loss does not result from the advertising activity, and cannot be used to offset UBTI attributable to any trade or business activity other than the advertising activity. Sec. 1.512(a)-1(f)(ii), Income Tax Regs.↩
8. Respondent agrees that a determination of the circulation income issue in petitioner's favor would dispose of fiscal years 1981 and 1982, but claims that issues would still exist for fiscal year 1983.↩
9. The parties agree that sec. 1.512(a)-1(f)(4)(ii), Income Tax Regs.↩, is inapplicable in the instant matter.
10. Although the numbers change, the issue is the same for the entire period at issue. For convenience, this Opinion will use the numbers applicable to petitioner's fiscal 1981 year, unless otherwise noted.↩
11. Each local association member paid approximately $ 150 annually to his respective local association. Respondent claims that the local association member's $ 23 in "national dues" flowed through to petitioner. Respondent apparently asserts that approximately $ 127 was still paid to the local association as dues.↩
12. We do not believe the fact that "a very small number" of second subscriptions were sent to local association members for an additional $ 1 changes this result. Admittedly, the analysis is not as clean when the second subscriptions are considered. However, getting the second subscription for $ 1 was contingent in the first instance on being a member of a local dues-paying association. In any event, the number of second subscriptions "sold" to nonmembers when combined with the number of sales to nonmembers for $ 3 and $ 4 would still not satisfy the 20-percent standard of rule (i). Additionally, since LAN apparently was not available to persons eligible to join a local association during much of the period at issue, it is not entirely clear that the amounts petitioner received for these second subscriptions were not being recorded in the LAN nonmember subscription account on petitioner's working trial balances. See also infra↩ note 13.
13. Again, this is a 1981 number. For 1982 and 1983, petitioner argues that 2,019 and 2,664 subscriptions, respectively, were sold to nonmembers. The record is not clear how petitioner derived the number of subscriptions that it claims were sold to nonmembers. It appears that petitioner merely took its nonmember subscription income account and assumed the income was attributable to subscription sales of $ 1 each. If all these sales were for $ 3 or $ 4, the number of nonmember subscriptions sold was at most approximately one-third that claimed by petitioner.↩
14. Respondent's notice also disallowed a portion of losses attributable to the sale of securities; petitioner concedes this point on brief.↩
15. Petitioner claims that in determining costs directly connected with the publication of LAN, there are eight steps: Step 1 is to identify costs within the LAN department that relate solely to either the advertising or editorial side of the magazine; step 2 is to identify costs within the LAN department that pertain both to advertising and editorial; step 3 is to identify costs outside the LAN department that are attributable directly to LAN; step 4 is to identify indirect costs that are associated with LAN. To allocate the indirect costs in step 4 to LAN from NALU's other activities, petitioner states that LAN should be treated as absorbing indirect costs of NALU in the same proportion as it absorbs direct costs. Petitioner then claims that total periodical costs of LAN, as determined in the four steps above, should be allocated between the advertising and editorial departments of LAN in a series of four related steps that correlate to the first four: Step 5 is to allocate the expenses previously identified in step 1 above 100 percent to the portion of the magazine to which they relate (advertising or editorial); step 6 allocates between advertising and editorial expenses the other costs within the LAN department identified in step 2 above; in step 7, the direct costs of LAN outside the LAN department, identified in total in step 3 above, are allocated between advertising and editorial expenses; and step 8 allocates indirect costs of LAN, as identified in total in step 4 above, between advertising and editorial expenses on the basis of magazine content, via the page count of the advertising and editorial content of LAN.↩
16. Petitioner argues that NOL's would arise if it were permitted to use its eight-step allocation method in various years not at issue.↩